[No. S049973. Dec. 6, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
DOUGLAS OLIVER KELLY, Defendant and Appellant.

COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Evan Young, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Stephanie C. Brenan, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CHIN, J.**—A jury convicted defendant Douglas Oliver Kelly of the first degree murder of Sara Weir under the special circumstances of robbery and rape murder and with personal use of a deadly weapon. (Pen. Code, §§ 187, 190.2, subd. (a)(17), 12022, subd. (b).)[1] After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict (§ 190.4) and imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

### I. FACTS

#### A. *Guilt Phase*

##### 1. *Overview*

On September 15, 1993, 10-year-old Eric A. discovered Sara Weir's nude and decomposing body under his bed in the apartment where Eric lived with his mother, Michelle T., and, for a while, defendant.[2] The evidence presented at trial established that defendant had stabbed Sara to death with a pair of scissors several days earlier.

##### 2. *The Evidence*

The prosecution presented evidence regarding defendant's and Sara's actions in the weeks and, especially, days before defendant killed her. Defendant, who apparently had little money and owned no car, frequented a fitness center in Burbank, where he met and befriended a number of women, including Sara, Michelle T., and Teri B. Michelle and Teri testified that at first

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] All further dates are in the year 1993 unless otherwise indicated.

defendant was a friendly and seemingly caring person. He told them, and they believed at first, that he had a wealthy family in Chicago. He also led them to believe he was a manager or part owner of the fitness center.

Sara, who was 19 years old when she was killed, lived with a friend and had a job at Warner Bros. Studios. Martha Farwell, Sara's adoptive mother, described her as naïve and trusting. During the summer of 1993, she visited the fitness center quite often, where she met defendant. Defendant became her personal trainer. One time Sara went with a friend to defendant's apartment to look at a dog. Sara told people that defendant was her personal trainer but never suggested she had any other relationship with him. She mentioned to one friend that defendant had tried to flirt with her but she was not interested. She had other boyfriends that summer.

Sara spent the Labor Day weekend with her mother and left to go to her home the afternoon of Labor Day itself, September 6. One friend was expecting to hear from her sometime that same day, during the evening at the latest. The next morning, September 7, shortly after 9:00 a.m., Sara called her place of work and said that "she wasn't going to be at work today because a friend had committed suicide and she had to deal with that." She sounded upset. Sara's mother testified that she knew of no such suicide. Sara had made plans with another friend to see a movie around September 8 and to go to the Hollywood Bowl on September 11. Neither Sara's mother nor her friends ever saw or heard from her again until her body was discovered.

Michelle testified that she and defendant began dating. Eventually, defendant moved into her apartment at 4950 Laurel Canyon, apartment 110, in North Hollywood, where she lived with her son, Eric A. The three lived together in that apartment for about five months until late August. Defendant often spoke of Sara Weir. He told Michelle that Sara had hired him to do weight training.

At some point, defendant offered to become Teri's personal trainer, which she accepted. He also asked Teri to work in his family business, promising that his mother would pay her when she arrived from Chicago. Teri agreed, and she believed she had a working relationship with defendant for about two weeks, although she was never paid. She once told defendant she needed to be paid. He gave her one of Michelle's checks, in the amount of $2,000, but the check bounced.

During this time, defendant also sought to obtain money from acquaintances. Leticia Busby testified that she met defendant at the fitness center, where she worked as an aerobics instructor. On August 26, defendant asked to borrow her credit card so he could take his girlfriend to San Diego for the weekend. She refused.

Helen Walters also knew defendant from the fitness center. He told her that he had just received a family inheritance, but he needed some money to rent a car to go to Disneyland, where he planned to set up a food business. He asked to use Walters's credit card, offering to pay off the $300 balance on the card account if she allowed him to do so. He showed her his bankbook, which indicated he had much money, but he also said he did not have a credit card, so he needed to borrow hers. Walters trusted him and permitted him to use her card. He charged $900 to her card but never repaid her. She last spoke with him around August 29 or 30. He told her then that he would get her the money, but she never heard from him again.

Damon Stalworth owns a restaurant. He came to know and to trust defendant. Defendant gave him "the impression that he had access to cash." Around August, Stalworth accepted two personal checks from defendant that were in someone else's name, possibly Teri B.'s. He gave defendant cash. "It was like a loan, just to get cash." The checks bounced, and defendant never repaid Stalworth. Teri testified that she did not give defendant permission to write a check of hers for cash.

On Monday, August 30, defendant asked Teri to come to his apartment on Laurel Canyon to meet his mother, who was supposedly coming to town. Teri believed the mother would have money to pay her what defendant owed her. She went to the apartment shortly after noon, but defendant said his mother had not yet arrived. Later, when the mother did not appear, Teri began to get concerned and wanted to leave. She went to the bathroom. When she came out, defendant assaulted her with a pair of scissors. He forced her into the master bedroom, where he held the scissors to her throat, drawing blood. Defendant threatened to kill her. In order to survive, Teri did not resist what followed. Defendant forced her to disrobe, raped her twice, and sodomized her twice. After that, he poured champagne and whiskey into two glasses, from which they drank. Then he raped her again and orally copulated her.

Afterwards, defendant had Teri get dressed, and they drove to a restaurant in her car, where they stayed for about 15 minutes. Then they drove some more. During this drive, around 6:00 to 7:00 p.m., defendant had a conversation with Michelle on his cell phone. Michelle and defendant argued, and defendant became quite angry. During this conversation, Teri came to realize that much of what defendant had said about himself and his family was not true. Eventually, Teri managed to get away from defendant. She did not report the rape until just before she testified at trial because, she said, she was ashamed and, due to defendant's threats, terrified.

Michelle testified that that same Monday, August 30, she and Eric arrived home after his football practice sometime around 8:00 p.m. or a bit later. The

apartment was open. "The balcony doors were wide open and the lights were on and wine glasses, empty champagne bottles were in the house." They found a dirty towel and women's glasses and underwear that were not Michelle's. After that, defendant and Michelle spoke on the telephone, but defendant did not return home until about midnight.

When defendant returned, and while he was still outside, Michelle told him, "as I had told him previously on the phone, that I didn't want him to come to the house . . . ." Defendant kicked the door open. "He almost broke it off the hinges." He grabbed Michelle by the neck and started to strangle her with both hands, hard enough to penetrate the skin of her neck with his fingernails. He spent the night with her. The next day, August 31, defendant permitted her to go with her son to his football practice. When she did so, she called the police and defendant was arrested. The day after that, September 1, she learned that defendant had been released from custody. The same day, she obtained a restraining order to keep him from coming to the apartment. Because she was frightened, she went to live with her sister. She did not return to her apartment again except occasionally to get clothing.

The manager of Michelle's apartment building testified that on August 30, the door of apartment 110 (Michelle's apartment) had been kicked in. The next day, the manager had the door fixed. The day after that she had a new lock put on the door. She gave Michelle, but not defendant, a key to the new lock. Michelle testified that a person could reach the apartment's balcony from the outside.

Karrie Marshall worked at a café inside the fitness center and knew defendant. She testified that shortly before Labor Day, defendant called her at her home. He said he was in jail and asked her to help bail him out by obtaining some money from a friend of his. She declined. Later the same day, defendant called her again. He said he was out on bail and asked if he could come to her apartment to pay her some money he owed her. He arrived around 3:00 to 4:00 p.m. She had a male friend with her. Defendant seemed surprised to see the friend. He did not have the money and gave no explanation for not having it. After about half an hour, he left. Around 8:00 that evening, defendant called her again. He said that he had the money this time and would come to her apartment again in about an hour. He arrived around 12:30 a.m. that same night and knocked on her door. Karrie did not let him inside, but she observed him through the peephole. She asked defendant what he needed. He asked if he could come in. He said, "Michelle changed the locks on the apartment doors and I need a place to crash. Can I crash on your couch for a couple hours?" Karrie was alone at this point. She was scared and "had a bad feeling" about defendant. She did not let him into the apartment, and defendant left.

Rosell Momon, who also became acquainted with defendant at the fitness center, testified that shortly before Labor Day he received a call from defendant. Defendant said he had gotten into an argument with his girlfriend, had been in jail, had just gotten out, and wanted a ride. Momon picked him up. Defendant said he thought he might have a restraining order against him. He asked if he could stay with Momon for a few days until his girlfriend "cooled down." Defendant stayed with Momon for about two days. During that time, defendant occasionally left to look for Michelle. On Labor Day, Momon drove defendant back to the apartment on Laurel Canyon. Defendant expressed concern about whether he would be able to get inside the apartment. Momon observed defendant climb to a balcony to get into the apartment. The next day, defendant called Momon again. Defendant said he was "hanging out" with a girl. Defendant said it was not his girlfriend but another girl. Momon did not know who the girl was.

On Labor Day, Michelle visited her apartment. Nothing about its condition suggested to her that someone had visited it since she left. Michelle observed defendant's briefcase in the apartment. She thought he had left it there when he was arrested. She looked inside the briefcase and found defendant's mother's telephone number. Michelle called his mother and learned that much of what he had told her about himself was untrue. The briefcase also contained some of Michelle's blank checks with her apparent signature and a piece of paper with her name written on it three times. Michelle testified she had not signed the checks but the writing looked somewhat like hers, as if someone was trying to copy her name.

Defendant's briefcase also contained some blank checks with Teri's apparent signature, Teri's sunglasses, and Teri's driver's license. Teri testified that she never gave defendant any of her blank checks, and that she had not signed them. The handwriting on the checks was similar to, but was not, hers. She did not give defendant permission to possess these items.

Michelle visited her apartment on other occasions after Labor Day. The next time she went to the apartment, she noticed that the piece of wood she had placed by the sliding glass door to secure it had been removed. She also observed a consumed bottle of champagne and some wine glasses on the kitchen counter that had not been there previously. This indicated to Michelle that someone had recently been inside the apartment. Michelle also eventually discovered that some of her jewelry was missing.

After Labor Day, Michele noticed an unusual odor coming from the bathroom or hallway area. The odor got stronger over time. Eventually, during another visit, on September 15, Eric discovered Sara's body under the bed in his bedroom.

The body was nude and wrapped in a blanket. Its decomposed condition indicated that death had occurred some time previously. A plastic bag covered the head and a baseball helmet belonging to Eric was over the bag. The bag was secured around the neck by tape that was identical to a roll of tape from a box in the kitchen. Defendant's palm print and fingerprints were found on the roll of tape, the helmet, and the bed in Eric's bedroom.

The autopsy revealed that Sara had died of a total of 29 stab wounds by a single weapon, possibly scissors. The body provided no physical evidence of a sexual assault but, given its decomposed state, this did not mean a sexual assault had not occurred. A few days after the body was discovered, a pair of bloodstained scissors was discovered in the box in the kitchen that contained the roll of tape. The scissors could have inflicted the wounds on Sara's body. Michelle testified that she had last left the scissors on the nightstand by her bed. Teri testified that the scissors were similar to the ones defendant had used to assault her. The blood on the scissors could not have been Teri's.

Robert Coty, the manager of an apartment building across the street from Michelle's apartment, testified that shortly after Labor Day, he observed some activity in Michelle's apartment while looking through a sliding glass window into the apartment. He saw a shirtless man who appeared to be the man who had been living in the apartment. He also observed a "Caucasian" person with dark hair who appeared to be sitting or kneeling. (Sara's biological mother was a Canadian Blackfoot Indian; Michelle is African-American.) The person appeared to be wearing no clothes. At one point, Coty used the word "she" when referring to this person, but otherwise he said nothing about the person's gender, using instead the neutral word "person." Coty observed the man "walk around this person, made like two walk arounds and then right after the second walk around of that person, he closed up the drapes." He testified that "the person who was sitting or kneeling, they were kind of crunched up like they were being dominated, like they were being scolded or something."

Shortly after the body was discovered, the police attempted unsuccessfully to find defendant. Eventually, defendant was detained in Laredo, Texas, on November 24 while he was attempting to enter the United States from Mexico. He possessed two of Sara's checks containing her apparent signature. Sara's mother testified that the handwriting on the checks was not Sara's. Sara's vehicle, a Ford Bronco, was found in Mexico. Her purse was missing from her apartment and was never found.

Jodi D. testified that in December 1987, she was a waitress and defendant a cook at a restaurant in Florida. One night after work, she was with defendant and others at another restaurant. She and defendant started talking about

relationships, and especially her relationship with her boyfriend. Defendant seemed sincerely interested and honest. She trusted him and felt comfortable with him. When the group broke up, defendant suggested continuing the conversation elsewhere. She agreed, and they drove to other places. She drove because defendant did not have a car. During this time, defendant told her he was planning to open a restaurant. He showed her a restaurant that he said he was going to rename "Mr. Kelly's." He also directed her to a gas station that he claimed to own. She believed him. He said he wanted to show her a room he rented for when he had to work late. She agreed. They parked by a convenience store and walked to a nearby boarding house. Defendant said he wanted to get some money. She still believed him. Eventually, they entered one of the rooms. Inside, defendant raped her repeatedly and took some of her jewelry and her watch. Jodi reported the incident and defendant was arrested. Later he entered into a plea bargain for a lesser crime than he was charged with and received "time served."

Kim V., a native of South Africa, testified that in 1991 she was visiting Miami as part of a tour of the United States. She met defendant at a youth hostel. He seemed friendly. He told her he was a chef and could get her a job. They socialized after that. He gave her the impression that he was well off and did not have to work because he received a family allowance. One evening, Kim and defendant went to a couple of bars. Eventually, they went into defendant's room at the hostel, where she had left some items. Then defendant refused to let her go. He covered her mouth with his hand and threatened to kill her if she screamed. He held a knife to her throat and dragged her toward the bed. He raped her repeatedly. "Between the rapes" he seized some of her jewelry. Eventually, defendant fell asleep, and Kim managed to escape, taking her jewelry in the process. Kim reported the incident, but defendant had left by the time the police arrived at the hostel, and he was not arrested.

Defendant did not present any evidence at the guilt phase.

B. *Penalty Phase*

Esther D. testified that in 1984 in New Jersey, defendant raped her repeatedly. Later she heard that he had been indicted for the crime, but he served only 364 days in custody pursuant to a plea bargain. After his release, she saw him in town several times. One time he walked past her and said "he was going to get me." Another time he told her "he was going to kill me."

Martha Farwell, Sara's mother, testified about Sara and the impact her death had on her family. She prepared a videotape of Sara's life that was played to the jury.

Defendant did not present any evidence at the penalty phase.

## II. DISCUSSION

### A. Jury Selection Issues

#### 1. Excusing Two Prospective Jurors for Cause

■ Defendant contends the court erred in excusing two prospective jurors for cause over his objection. The court excused the first prospective juror because the deputy district attorney who was prosecuting this case had previously prosecuted her son's uncle on rape charges and obtained a conviction. The prospective juror said she did not know what the charges against the uncle had been, but she knew he was in prison at the time of trial. "A party may challenge a prospective juror for actual bias, defined as a state of mind that would prevent that person from acting impartially and without prejudice to the substantial rights of any party." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 488 [117 Cal.Rptr.2d 45, 40 P.3d 754].) "[T]he qualification of jurors challenged for cause [is a] matter[] within the wide discretion of the trial court, seldom disturbed on appeal." (*Odle v. Superior Court* (1982) 32 Cal.3d 932, 944 [187 Cal.Rptr. 455, 654 P.2d 225].)

We cannot say the trial court abused its discretion in excusing this juror. A trial court could reasonably conclude that a prospective juror would be biased against a prosecutor who had personally prosecuted for rape a man who would have been her brother-in-law had she married her son's father. Moreover, any error was harmless. Generally, error in excusing jurors for reasons not related to their views regarding the death penalty does not require setting aside the judgment. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1037 [90 Cal.Rptr.2d 607, 988 P.2d 531]; *People v. Holt* (1997) 15 Cal.4th 619, 656 [63 Cal.Rptr.2d 782, 937 P.2d 213].) "Defendant has a right to jurors who are qualified and competent, not to any particular juror." (*People v. Holt, supra,* at p. 656.)

■ The court excused the second juror because of his views on the death penalty. Unlike error in excusing jurors for cause unrelated to their views on the death penalty, "the erroneous exclusion of a prospective juror because of that person's views on the death penalty is reversible per se." (*People v. Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865], italics omitted, citing *Gray v. Mississippi* (1987) 481 U.S. 648 [95 L.Ed.2d 622,

107 S.Ct. 2045].) But we see no error. "The trial court may excuse for cause a prospective juror whose view on the death penalty would prevent or substantially impair the performance of the juror's duties. On appeal, we uphold the trial court's ruling if the record fairly supports it, and we accept as binding the trial court's determination of the juror's true state of mind if the juror has made conflicting or ambiguous statements." (*People v. Cleveland* (2004) 32 Cal.4th 704, 735 [11 Cal.Rptr.3d 236, 86 P.3d 302].)

In this case, the prospective juror said some things suggesting that he could be fair to both sides and could impose the death penalty if appropriate. But, in response to questioning by the district attorney, he also stated that "morally I'm opposed to [the death penalty] because I don't think anybody really has a right to take another person's life regardless, and it doesn't make it any more right for the government to do it than it is for an individual to do it." He reiterated, "That's morally the way I feel." In response to the district attorney's statement that he, the district attorney, had "trouble with the idea that you would abandon your own morality," he said, "I have the same trouble." He agreed with the prosecutor that he "might not be the best juror for a death penalty case although excellent for any other murder case . . . ." The court excused the juror, stating that "the more [the prosecutor] questioned, it's clear to me that [the juror] would never vote for the death penalty." In light of the juror's conflicting and ambiguous statements, we must accept the trial court's determination of his true state of mind. As the United States Supreme Court recently explained, "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown* (2007) 551 U.S. 1, ___ [167 L.Ed.2d 1014, 127 S.Ct. 2218, 2224].) No error appears.

### 2. *Prosecutor's Use of Peremptory Challenges*

Defendant contends the prosecutor improperly exercised one peremptory challenge against one prospective alternate juror because she was African-American. (See *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].) The record does not support the contention.

The prosecutor originally accepted the panel of prospective alternate jurors when two members of the panel were African-American. Then, after defense counsel exercised a peremptory challenge to one of the non-African-American jurors, the prosecutor challenged one of the African-American jurors. At this point, defense counsel objected that the challenge was discriminatory, and the court held a hearing. The court denied defendant's objection but invited the prosecutor to comment.

The prosecutor explained that he exercised the peremptory challenge partly because the prospective juror indicated she would have difficulty "implementing . . . the use of aggravating, mitigating factors." This indicated to him that "she probably would have some difficulty imposing the death penalty." Additionally, he was concerned that she had been a social worker. He explained that "defendant in this case had early childhood problems without his father being around. I don't know if that's going to come up, but I would suspect [the] defense would bring that out, and that I think her empathy for that, she chose for a while a path of counseling children, helping them out, which I think is a wonderful thing, but I think it may show a bias or a concern for children in those situations. I thought she would be biased." Additionally, he noted that on her questionnaire, "she wrote probably five times as much as any other juror, which may have just been helpful. May have been she wanted to be helpful, but I just found it very disturbing. It was just so odd that a person would be so expressive and redundant and repetitive and she'd write the same answer three or four or five times. I just felt very strange about her."

The second African-American prospective juror became an alternate juror. Later, she was substituted in as an actual juror and, ultimately, she became the jury foreperson.

■ The dispositive question here is whether defendant made a prima facie case of group bias. To do so, the defendant must show that under the totality of the circumstances it is reasonable to infer discriminatory intent. (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 [60 Cal.Rptr.3d 209, 160 P.3d 84].) Where, as here, it is not clear whether the trial court used the "reasonable inference" standard, rather than the recently disapproved "strong likelihood" standard, we review the record independently to determine whether the record supports an inference that the prosecutor excused a juror on a prohibited discriminatory basis. (*Id.* at pp. 341–342.) "In deciding whether a prima facie case was stated, we consider the entire record before the trial court [citation], but certain types of evidence may be especially relevant: '[T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors

belong, these facts may also be called to the court's attention.' (*People v. Wheeler*, *supra*, 22 Cal.3d at pp. 280–281, fn. omitted.)" (*Id.* at p. 342.)

We find nothing in this record to support the conclusion that the prosecutor excused the African-American prospective juror because of her race. It is true that defendant is himself African-American, but that fact alone does not establish a prima facie case of discrimination. Whether his victim, Sara Weir, was a member of the group to which a majority of the remaining jurors belong is debatable. The record shows that her biological mother was a Blackfoot Indian. In any event, the race of the victim, by itself, does not also establish a prima facie case of discrimination. Here, the prosecutor used only one peremptory challenge against an African-American. He passed the alternate jurors once with two African-American jurors remaining, and he never challenged the other African-American juror. The fact that the prosecutor accepted the jury panel once with both African-American jurors on it, and exercised the single challenge only after defense counsel exercised his own challenge, strongly suggests that race was not a motive behind the challenge. (*People v. Cornwell* (2005) 37 Cal.4th 50, 69–70 [33 Cal.Rptr.3d 1, 117 P.3d 622]; *People v. Reynoso* (2003) 31 Cal.4th 903, 926 [3 Cal.Rptr.3d 769, 74 P.3d 852].) Moreover, the prosecutor's questioning of the prospective juror was probing, not desultory.

Defendant notes that, during selection of the original jury panel, two African-Americans, apparently the only two of that group to be called into the jury box at that stage, were excused for cause, one on the prosecutor's motion. (The latter was the prospective juror who was excused because the prosecutor had previously prosecuted her son's uncle on rape charges. [See pt. II.A.1., *ante*].) He argues that this circumstance shows that the "prosecutor was achieving what he wanted: a jury with few or no African-American jurors." We disagree. Many prospective jurors are excused for cause. The prosecutor was entitled to challenge for cause the one juror because of a legitimate concern that she might be biased against him under the circumstances. As the trial court stated when defense counsel argued this point at trial, whether it correctly excused that prospective juror for cause was a separate issue unrelated to whether the prosecutor was acting discriminatorily. The other prospective African-American juror was excused pursuant to stipulation because she had been a rape victim, and she said her emotions would make it too painful for her to be a juror. Defendant asserts that the prosecutor had "the second African-American prospective juror excused by stipulation . . . ." In fact, the record shows that *defense counsel* suggested she be excused by stipulation. The prosecutor acquiesced in this suggestion, but before he did so he also stated, "If at all possible I would like to keep her because she seems very intelligent, very nice and honest, but it does seem like she was tearing up just talking about the incident."

Although not required to do so, the prosecutor also stated three race-neutral reasons for his peremptory challenge. Defendant challenges these reasons in various ways, but, under the circumstances, we see no reason to doubt the sincerity of the prosecutor's explanation. Because the record does not support the inference that the prosecutor used this single peremptory challenge against an African-American juror on the basis of her race, the trial court properly overruled defendant's trial objection.

B. *Guilt Phase Issues*

1. *Defendant's Absence from Proceedings*

Defendant was apparently absent from a few conferences regarding legal matters that were held in the hallway outside the presence of the jury. Defense counsel was present on all occasions. Defendant contends his absence violated his constitutional and statutory rights to be present. We disagree.

Defendant complains of five occasions when he was personally absent: (1) during jury selection when one prospective juror was questioned and ultimately excused for cause because the prosecutor had personally prosecuted her son's uncle; (2) during jury selection when one juror was excused for cause because of his views regarding the death penalty; (3) during jury selection when his objection to the prosecutor's peremptory challenge against the African-American prospective alternate juror was argued and denied; (4) when the parties and court discussed the admissibility of evidence that the murder victim had consumed alcohol on occasions not connected to her death; and (5) when the prosecutor informed the court and defense counsel that Teri B. had recently stated that defendant had raped her.

The record does not clearly establish defendant's absence on these occasions. It merely indicates that the proceedings in question "were held in the hallway." However, the Attorney General does not deny that defendant was personally absent on those occasions, and we will assume that he was absent.

■ "Broadly stated, a criminal defendant has a right to be personally present at certain pretrial proceedings and at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, the due process clause of the Fourteenth Amendment to the United States Constitution, section 15 of article I of the California Constitution, and sections 977 and 1043." (*People v. Cole* (2004) 33 Cal.4th 1158, 1230 [17 Cal.Rptr.3d 532, 95 P.3d 811].) "[A] defendant's right to be present depends on two conditions: (1) the proceeding is critical to the outcome of the case, and (2) the defendant's presence would

contribute to the fairness of the proceeding. [Citations.] Thus a defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding. Examples include the exclusion of a defendant from a conference on the competency of child witnesses [citation], a conference on whether to remove a juror [citation], and a conference on jury instructions [citation]." (*People v. Perry* (2006) 38 Cal.4th 302, 312 [42 Cal.Rptr.3d 30, 132 P.3d 235].)

The occasions on which it appears defendant was excluded in this case all involved legal questions of the type that we have routinely held do not require defendant's personal presence. Defendant claims, in essence, that had he been present, he could have advised counsel to make better legal arguments. A similar claim could be made about any occasion involving legal issues. Nothing in this record suggests that defendant's presence on these occasions would have made any difference. Defendant relies on cases in which both the defendant and defense counsel were excluded from the proceeding. (*People v. Ayala* (2000) 24 Cal.4th 243, 259–269 [99 Cal.Rptr.2d 532, 6 P.3d 193] [excluding defendant and defense counsel from hearing on reasons for peremptory challenges was error but harmless]; see also *id.* at pp. 291–300 (dis. opn. of George, C. J.) [arguing that the error was prejudicial]; *U.S. v. Thompson* (9th Cir. 1987) 827 F.2d 1254.) There is, however, an obvious difference between excluding both the defendant and his attorney and merely excluding the defendant. In this case, unlike the cases defendant cites, defense counsel was present on all occasions and was able to fully represent defendant's interests.

### 2. *Admission of Evidence of Uncharged Misconduct*

Over objection, the court admitted evidence of three types of uncharged misconduct by defendant: (1) evidence regarding defendant's financial dealings with other women he had met at the fitness center shortly before Sara's death; (2) evidence of defendant's assault on Michelle T.; and (3) evidence of defendant's rapes of Teri B., Jodi D., and Kim V. In making its rulings, the court reviewed, and was guided by, our then recent decisions in *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*) and *People v. Balcom* (1994) 7 Cal.4th 414 [27 Cal.Rptr.2d 666, 867 P.2d 777] (*Balcom*). The court also explained to the jury the limited use it could make of this testimony. Defendant contends the court erred in admitting this evidence.

Evidence Code section 1101, subdivision (a), generally prohibits "evidence of a person's character or a trait of his or her character" when it is "offered to prove his or her conduct on a specified occasion." Subdivision (b)

of section 1101, however, provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

In general, we have explained that "[t]he admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence." (*People v. Carpenter* (1997) 15 Cal.4th 312, 378–379 [63 Cal.Rptr.2d 1, 935 P.2d 708].) The main policy that may require exclusion of the evidence is the familiar one stated in Evidence Code section 352: Evidence may be excluded if its prejudicial effect substantially outweighs its probative value. Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value. (*Ewoldt, supra*, 7 Cal.4th at p. 404.) This determination lies within the discretion of the trial court. (*People v. Carpenter, supra*, at p. 380.)

In *Ewoldt, supra*, 7 Cal.4th 380, we discussed specific situations when evidence of uncharged crimes may be admitted under Evidence Code section 1101, subdivision (b): "[E]vidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan. [¶] In determining whether evidence of uncharged misconduct is relevant to demonstrate a common design or plan, it is useful to distinguish the nature and degree of similarity (between the uncharged misconduct and the charged offense) required in order to establish a common design or plan, from the degree of similarity necessary to prove intent or identity.

"The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' (2 Wigmore, [Evidence] (Chadbourn rev. ed. 1979) § 302, p. 241.) In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]

"A greater degree of similarity is required in order to prove the existence of a common design or plan. . . . [I]n establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' (2 Wigmore, *supra*, (Chadbourn rev. ed. 1979) § 304, p. 249, italics omitted.) '[T]he difference between requiring similarity, for acts negativing innocent intent, and requiring common features indicating common design, for acts showing design, is a difference of degree rather than of kind; for to be similar involves having common features, and to have common features is merely to have a high degree of similarity.' (*Id.* at pp. 250–251, italics omitted . . . .)

"To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . [E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]

"The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' (1 McCormick [on Evidence (4th ed. 1992)] § 190, pp. 801–803.)" (*Ewoldt*, *supra*, 7 Cal.4th at pp. 401–403, citation & fn. omitted.)

Applying these standards in *Ewoldt*, *supra*, 7 Cal.4th 380, a prosecution for committing lewd acts on a child, we upheld the admission of prior uncharged lewd acts on the complaining witness and her sister. We held "that the evidence was admissible to establish that the charged offenses were committed pursuant to the same design or plan used by defendant in committing the uncharged offenses." (*Id.* at p. 386.) In *Balcom, supra,* 7 Cal.4th 414, a prosecution for rape and robbery, we upheld the admission of a similar rape and robbery that the defendant later committed in Michigan against a different victim. We held that "evidence tending to establish that, soon after the commission of the charged offenses of rape and robbery, defendant

committed a rape and robbery in Michigan in a manner quite similar to the charged offenses, was admissible to demonstrate the existence of a common design or plan which, in turn, was relevant to demonstrate that defendant either employed or developed that plan in committing the charged offenses." (*Id.* at p. 418.)

The trial court did not abuse its discretion in admitting the evidence in this case. Defendant discusses each act in isolation and argues it should not have been admitted. But each act did not occur in isolation but as part of a larger pattern, a pattern that was highly relevant to understanding what happened to Sara Weir. Viewed as a whole, this evidence shows a remarkably similar and consistent pattern. Defendant continually lied to and manipulated women including, in particular, women who, like Sara Weir, he befriended at the fitness center. As a specific example of the pattern, he continually led them to believe he came from a wealthy family. He did so consistently to obtain their property. The evidence shows he could be very charming and, at first, convincing. He also continually lured women to his home, where he robbed and raped them.

Sara's death did not occur in a vacuum. She did not survive her encounter with defendant to tell her story. But, fortunately, many others—Michelle T., Teri B., Jodi D., Kim V., Leticia Busby, Helen Waters, Karrie Marshall—did survive and can tell their tales. Their testimony was critical to the jury's full understanding of the circumstances of Sara's death. The pattern their testimony established helped the jury to understand how and why Sara came to be in the apartment with defendant on that fatal occasion. (Her mother described her as naïve and trusting; the jury could reasonably infer that she also believed defendant's stories and was lured to the apartment just like defendant lured other trusting women to his home.) It also helped the jury to understand what defendant intended when he assaulted and ultimately killed Sara—both to take her property and to rape her.

Defendant first challenges the testimony of his financial dealings with other women he befriended at the fitness center. This testimony was, however, highly probative. From the evidence at trial, the jury could reasonably conclude that defendant took Sara's vehicle, which was found in Mexico after he was arrested when he was attempting to enter the United States from Mexico; at least two of her checks, which were found in his possession when he was arrested; and probably her purse, which was never found. Issues contested at trial, and indeed still in this appeal, were whether defendant formed the intent to take these items before or at the time he applied force or fear and, if so, whether the robbery was merely incidental to the murder. (*People v. Green* (1980) 27 Cal.3d 1, 54, 61 [164 Cal.Rptr. 1, 609 P.2d 468].) The evidence of defendant's financial dealings with other women showed that

defendant continually sought to obtain property from the women, and that virtually nothing that he did to obtain property was an afterthought. This pattern strongly suggested that defendant took Sara's property pursuant to a common plan rather than merely as an afterthought.

Defendant specifically challenges the admissibility of the testimony of Leticia Busby and Karrie Marshall. Although their testimony was not quite as probative as the other evidence, it was also not particularly prejudicial. Evidence that defendant attempted to borrow Busby's credit card, albeit unsuccessfully, manifested a common plan to obtain money from the women he met at the fitness center, which, in turn, helped show that his taking of Sara's property was not merely an afterthought. Similarly, Marshall's testimony showed he was continually manipulating the women he met at the center. The jury could reasonably infer that defendant was attempting to be alone with Marshall in her apartment. This was a variation of the usual pattern in which defendant lured women to his home. The likely explanation for this variation is that Michelle T. had just excluded him from her apartment, so he had no home of his own to use. We see no abuse of discretion in admitting this evidence.

Defendant also specifically challenges the admissibility of Damon Stalworth's testimony that defendant cashed two personal checks at the restaurant Stalworth owns that were in someone else's name—possibly Teri B.'s—and that later bounced. This testimony, however, was just more of the same pattern. The jury could reasonably infer defendant's possession of two of Sara's checks when he was arrested was part of that pattern. This testimony was also admissible.

Evidence of defendant's assault on Michelle T. just a few days before he stabbed Sara Weir to death in the same apartment was also admissible as part of the pattern of deception followed by violence. Moreover, as the trial court recognized, it was highly probative on the issue of identity, particularly in conjunction with the assault and rape of Teri B. Sara's body was found in the apartment defendant had shared with Michelle. The jury could reasonably infer that she had been stabbed to death inside that apartment. Evidence that a few days before this stabbing defendant violently assaulted inside that same apartment two different women he had also befriended at the fitness center was evidence of "common features that are sufficiently distinctive so as to support the inference that the same person committed both [indeed, in this case, all] acts." (*Ewoldt, supra,* 7 Cal.4th at p. 403.) It would have been a remarkable coincidence if, shortly after defendant violently assaulted two women he befriended at the fitness center, some different person happened to use that same apartment to assault another woman defendant had befriended at the fitness center.

The rapes of Teri B., Jodi D., and Kim V., were similarly admissible. All three showed a remarkably similar pattern—defendant convinced his victims that he was wealthy, he lured them to his home, and then he raped and robbed them. The jury could reasonably infer from this evidence that defendant harbored similar intents—to rape and to rob—when he similarly lured Sara to the apartment and ultimately killed her. The assault of Teri B. was especially probative, on identity as well as intent. Not only did defendant rape a woman he befriended at the fitness center in the apartment where Sara's body was later found, but he also used what the jury could reasonably find was the *same weapon*—a pair of scissors that was conveniently at hand. These circumstances were distinctive indeed. Defendant contends there was not enough evidence that he intended to rape Sara to warrant admission of evidence of the other rapes. As we explain below, the overall evidence, including the evidence of the other rapes, was sufficient to permit the jury to find defendant intended to rape Sara. (See pt. II.B.3., *post.*) No reason appears for the trial court to have excluded any of this evidence.

We also conclude the trial court acted within its discretion in finding the probative value of the evidence was not substantially outweighed by the potential for undue prejudice. As explained, the evidence had substantial probative value; indeed, it was critical to the jury's full understanding of the circumstances surrounding Sara's death. Moreover, none of the other misconduct was particularly inflammatory compared to Sara's murder. (*Ewoldt, supra,* 7 Cal.4th at p. 405.) We see no error.

Defendant also argues that admitting this evidence violated his federal due process rights. (See *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378.) "We need not decide to what extent, if any, evidence solely going to character might violate due process (cf. *People v. Falsetta* (1999) 21 Cal.4th 903, 921–922 [89 Cal.Rptr.2d 847, 986 P.2d 182]), for, as explained, here the evidence" of defendant's prior misconduct was highly probative on several issues at trial. (*People v. Steele* (2002) 27 Cal.4th 1230, 1246 [120 Cal.Rptr.2d 432, 47 P.3d 225].)

### 3. *Sufficiency of the Evidence*

Defendant contends the evidence was insufficient to support a first degree murder conviction on either a premeditation theory or a felony-murder theory with either robbery or rape the underlying felony, and to support the robbery and rape special circumstance findings. "In determining the sufficiency of the evidence, 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a

reasonable doubt.' (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) The same standard of review applies when the evidence of guilt is circumstantial and to special circumstance allegations. (*People v. Valdez* (2004) 32 Cal.4th 73, 104–105 [8 Cal.Rptr.3d 271, 82 P.3d 296].)" (*People v. Horning* (2004) 34 Cal.4th 871, 901 [22 Cal.Rptr.3d 305, 102 P.3d 228].) We find the evidence sufficient to support each of the jury's verdicts.

■ Defendant argues that the evidence was insufficient to support a finding that defendant killed Sara in the course of robbing her for purposes of the felony-murder rule and the robbery-murder special circumstance. There was certainly evidence that defendant stole Sara's property. Her vehicle was found in Mexico, where defendant went at least for awhile after he killed Sara and before his arrest at the Mexico-United States border. Two of Sara's checks were on his person when he was arrested. Moreover, her purse was never found. Defendant also certainly used "force or fear" (§ 211) on his victim; indeed, he used the ultimate force—he stabbed her to death. Defendant argues that a reasonable jury had to find that the force or fear was unrelated to the taking—i.e., it had to find either he did not take the property from Sara's "person or immediate presence" (§ 211), or she gave him the property voluntarily before he used force or fear, or he achieved the intent to take the property only after he used the force or fear. We disagree. " '[W]hen one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.' (*People v. Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887]; accord, *People v. Hughes* [(2002)] 27 Cal.4th [287,] 357 [116 Cal.Rptr.2d 401, 39 P.3d 432].) Murders are commonly committed to obtain money or other property. (*Hughes, supra,* at p. 357.)" (*People v. Horning, supra,* 34 Cal.4th at p. 903.) Defendant notes that often, as to women he befriended but did not lure to his home, he obtained, or attempted to obtain, their property by guile rather than force or fear. This circumstance is true, but it does not make the jury's verdict unreasonable. Defendant definitely used force or fear against Sara. The jury could reasonably find that, as with Teri B., Jodi D., and Kim V., defendant lured Sara to his home and then used force or fear—probably both—to take her property. Additionally, the jury could reasonably find that at least some of Sara's property—for example, at least the keys to her car—was on her person or in her immediate presence when defendant used force or fear to take it.

Defendant also argues that any robbery was merely an afterthought and thus was only incidental to the killing. (See *People v. Horning, supra,* 34 Cal.4th at p. 904.) We disagree here too. The pattern of defendant's behavior shows that little that he did to acquire property from women he befriended at the fitness center and his other victims was merely an afterthought. He continually sought to obtain property from women and often succeeded. The

jury could reasonably find that the intent to steal was at least a concurrent motivation, and that defendant killed to facilitate the stealing. (*Ibid.*)

■ Defendant next argues the evidence was insufficient to support a finding that defendant killed Sara in the course of raping or attempting to rape her for purposes of the felony murder and the rape-murder special circumstance. He observes that Sara's body provided no evidence of a sexual assault. The decomposed state of the body when found might readily explain this circumstance. Moreover, for the special circumstance or felony-murder rule, there need not be an actual rape; an attempted rape is sufficient. (*People v. Kelly* (1992) 1 Cal.4th 495, 524–525 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Accordingly, the verdict would be supported if defendant had intended to rape Sara, but she resisted and he killed her without actually raping her. The combination of (1) the fact the body was nude when discovered, (2) Coty's testimony that he observed a man the jury could reasonably infer was defendant walk around a person the jury could reasonably infer was Sara while she was nude, and (3) defendant's pattern of raping (as well as robbing) women he lured to his home under similar circumstances provides ample evidence for a reasonable jury to find that defendant intended to rape Sara when he killed her. Nothing in this case required the jury to find that Sara was an exception to the pattern, and that defendant had no sexual intent when he lured Sara to his home. Defendant cites cases that, "as a group, may be read to establish 'that the victim's lack of clothing . . . is insufficient to establish specific sexual intent.' (*People v. Johnson* (1993) 6 Cal.4th 1, 41 [23 Cal.Rptr.2d 593, 859 P.2d 673].)" (*People v. Holloway* (2004) 33 Cal.4th 96, 139 [14 Cal.Rptr.3d 212, 91 P.3d 164].) But here, as in *Holloway, supra,* at page 139, the finding of an intent to rape rests on considerably more than the victim's nudity.

■ Finally, defendant contends there was insufficient evidence to find that he premeditated Sara's killing. The jury's true findings regarding the rape-murder and robbery-murder special circumstances show that the jury found that defendant killed Sara "in the perpetration of, or attempt to perpetrate . . . rape . . . [and] robbery," which itself makes the killing first degree murder. (§ 189.) Accordingly, we need not decide whether the jury could also have found the murder was premeditated. (See *People v. Chatman* (2006) 38 Cal.4th 344, 389 [42 Cal.Rptr.3d 621, 133 P.3d 534] [torture-murder special-circumstance finding made it unnecessary to decide whether the murder was also premeditated]; *People v. Johnson, supra,* 6 Cal.4th at p. 42 [insufficiency of the evidence of rape felony murder was harmless when evidence supports other theories of first degree murder].)

## 4. *Jury Instructions*

Defendant contends the trial court committed several errors in instructing the jury.

First defendant contends the court "erroneously failed to define rape and robbery, the two underlying offenses alleged to support the felony murder charge." However, the court did define the elements of both rape and robbery. Defendant recognizes this circumstance. But he argues that, due to the organization of the instructions and the fact that the court stated that one of the instructions that preceded the definitions of rape and robbery "applies only to the special circumstance instructions," the jury would believe those definitions concerned only the rape and the robbery special-circumstance allegations and not rape and robbery as elements of the rape and the robbery felony-murder rule. This claim is not cognizable on appeal. The actual instructions correctly stated the "law, . . . and if defendant favored further clarification, he needed to request it. His failure to do so waives this claim." (*People v. Marks* (2003) 31 Cal.4th 197, 237 [2 Cal.Rptr.3d 252, 72 P.3d 1222].) Moreover, we see no error. The trial court used the specific terms "robbery" and "rape" consistently in discussing both the felony-murder rule and the special circumstance allegations. It later defined those terms. It never suggested those terms had different meanings depending on whether they referred to the felony-murder rule or the special circumstance allegations. Reviewing the entire charge of the court, it is not reasonably likely the jury would believe that the definitions it received of robbery and rape concerned only the special circumstance allegations and that some different, unspecified, definitions adhered to the felony-murder rule. (See *People v. Young* (2005) 34 Cal.4th 1149, 1202 [24 Cal.Rptr.3d 112, 105 P.3d 487]; *People v. Kelly, supra,* 1 Cal.4th at pp. 525–526 & fn. 7.) If the jury had thought that some different definitions might apply to the felony-murder rule, surely it would have asked for clarification.

Next, defendant contends the court "delivered an erroneous felony-murder jury instruction that eliminated a finding of intent to commit the underlying felonies." The court instructed, "The unlawful killing of a human being, whether intentional, unintentional or accidental which occurs *during the commission or attempted commission of the crime* **or as a direct or casual** [*sic*: in context obviously meant to be 'causal'] **result** of robbery and/or rape is murder of the first degree when the perpetrator had the specific intent to commit such crime. [¶] The specific intent to commit rape and/or robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt." (Italics & boldface added; see CALJIC No. 8.21

(5th ed. 1988).)[3] This instruction is identical to CALJIC No. 8.21 as it existed at the time of trial except that the use note to the instruction stated that the italicized words and the words in boldface were supposed to be alternative choices depending on when death occurred. The use note contemplated that the court would use one phrase or the other, but not both.[4]

Defendant argues that, by using both the phrase in italics and the phrase in boldface, the court eliminated the requirement that the jury had to find defendant intended to commit the underlying felonies. Contrary to the Attorney General's argument, we believe this contention is cognizable on appeal despite defendant's failure to object or request a clarification. Defendant argues the instruction was not correct in law and omitted an element of the offense. If he were correct, the error would affect his substantial rights, thus making the claim cognizable. (§ 1259; *People v. Hillhouse, supra,* 27 Cal.4th at p. 503.) The argument lacks merit, however. Defendant constructs a complex theory whereby, he claims, the jury might read this instruction as not requiring an intent to commit the underlying crime for purposes of the felony-murder rule. But reading the entire instruction in context, including the last portion of the first sentence ("when the perpetrator had the specific intent to commit such crime") and the second sentence, informing the jury that the "specific intent to commit rape and/or robbery . . . must be proved beyond a reasonable doubt," we see no reasonable likelihood the jury would parse the instruction in a way that did not require the intent to commit the underlying felony.

██ Defendant contends the court erred in instructing the jury on first degree murder because the information charged him only with malice murder under section 187. The contention lacks merit. (*People v. Geier* (2007) 41 Cal.4th 555, 591–592 [61 Cal.Rptr.3d 580]; *People v. Hughes, supra,* 27 Cal.4th at pp. 368–370.) To the extent defendant contends he received inadequate notice of the prosecution's theory of the case, we have explained that "generally the accused will receive adequate notice of the prosecution's theory of the case from the testimony presented at the preliminary hearing or at the indictment proceedings." (*People v. Diaz* (1992) 3 Cal.4th 495, 557 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) Here, the information alleged that the murder was committed under the special circumstances of murder in the

---

[3] The written instructions the jury received were identical to the oral instructions as transcribed in the reporter's transcript except that the written instructions included the correctly spelled word "causal" and did not include the word "or" between the words "direct" and "causal."

[4] At the time of trial, the Use Note to CALJIC No. 8.21 (5th ed. 1988) stated, "If the death occurs substantially contemporaneously with the commission of the crime, use the first bracketed phrase [i.e., the language italicized as reprinted in the text above] and delete the second. On the other hand, if death occurs at a later period, use the second bracketed phrase [i.e., the language in boldface in the text] and delete the first."

course of robbery and rape, thus providing notice that the prosecutor would proceed under a felony-murder theory. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1131–1132 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

■ Defendant contends the court erred in failing to instruct on theft as a lesser included offense of robbery. However, he was not charged with robbery. "[W]hen robbery is not a charged offense but merely forms the basis for a felony-murder charge and a special circumstance allegation, a trial court does not have a sua sponte duty to instruct the jury on theft." (*People v. Valdez, supra*, 32 Cal.4th at pp. 110–111.)

The court gave the standard jury instruction informing the jury that motive is not an element of the offense, but the jury may consider, for whatever weight it finds it to be entitled, the presence or absence of motive as tending to establish guilt or innocence. (See CALJIC No. 2.51.) Defendant argues that this instruction impermissibly (1) allowed the jury to determine guilt based on motive alone, (2) lessened the prosecutor's burden of proof, and (3) shifted the burden of proof to imply that he had to prove innocence. The first of these arguments "merely goes to the clarity of the instruction" and hence is not cognizable on appeal. (*People v. Cleveland, supra*, 32 Cal.4th at p. 750.) Moreover, the entire argument lacks merit. (*People v. Cleveland, supra*, at p. 750; *People v. Prieto* (2003) 30 Cal.4th 226, 254 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Cash* (2002) 28 Cal.4th 703, 738–739 [122 Cal.Rptr.2d 545, 50 P.3d 332]; *People v. Hillhouse, supra*, 27 Cal.4th at pp. 503–504.) "The motive instruction did not itself include instructions on the prosecution's burden of proof and the reasonable doubt standard, but it also did not undercut other instructions that correctly informed the jury that the prosecution had the burden of proving guilt beyond a reasonable doubt." (*People v. Cleveland, supra*, at p. 750.)

■ Defendant argues that various standard instructions, specifically, CALJIC Nos. 1.00, 2.01, 2.21.1, 2.21.2, 2.22, 2.27, 2.51, 2.52, 2.90, 8.83, and 8.83.1, "impermissibly undermined and diluted the requirement of proof beyond a reasonable doubt." We disagree. (*People v. Crew* (2003) 31 Cal.4th 822, 847–848 [3 Cal.Rptr.3d 733, 74 P.3d 820]; *People v. Maury* (2003) 30 Cal.4th 342, 428–429 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Boyette* (2002) 29 Cal.4th 381, 438–439 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Montiel* (1993) 5 Cal.4th 877, 941 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) Each of these instructions "is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof." (*People v. Nakahara* (2003) 30 Cal.4th 705, 715 [134 Cal.Rptr.2d 223, 68 P.3d 1190].)

## C. *Penalty Phase Issues*

### 1. *Admission of Victim Impact Evidence*

The prosecution presented a single witness who provided victim impact evidence—Sara Weir's mother, Martha Farwell. Over objection, the court also permitted the prosecution to show the jury a videotape portraying Sara's life that her mother had prepared. Defendant contends (1) the court should not have admitted any victim impact evidence, (2) the court at least should have curtailed the mother's testimony, and (3) the court should not have admitted the videotape.

The first two of these contentions are not cognizable on appeal. Defendant did not object to the mother's testimony. Indeed, he expressly stated that the mother's own testimony "as to impact of Sara's life and her passing on her and the family . . . seems to be permissible by law." As is the case with the admission of any evidence, defendant has forfeited the issue by failing to object at trial. (Evid. Code, § 353, subd. (a); *People v. Robinson* (2005) 37 Cal.4th 592, 652 [36 Cal.Rptr.3d 760, 124 P.3d 363].)

 Moreover, the trial court would have had discretion to admit Farwell's testimony. "Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056–1057 [47 Cal.Rptr.3d 467, 140 P.3d 775].) "The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' " (*Id.* at p. 1056, quoting *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].) Defendant argues that no victim impact evidence was permissible in this case because the jury already heard evidence regarding Sara at the guilt phase, substantial other crimes evidence was admitted at the guilt and penalty phases, and he did not present any evidence himself. However, no such absolute limitations exist. Permitting victim impact evidence would have been well within the court's discretion even if defendant had objected.

Defendant also challenges specific portions of Farwell's testimony. While the court has the discretion to limit testimony, none of that given here was so emotionally charged that the court would have been required to exclude it had defendant objected. It properly focused on Sara's life and the pain her death caused her family and friends. This testimony was rather typical of the victim impact evidence we routinely permit. (See *People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1057.)

Defendant's challenge to the videotape is cognizable on appeal, as he did object to its admission at trial. The trial court watched the videotape, then ruled: "In looking at the tape yesterday, I believe that Mrs. Farwell could testify to everything that's contained in that tape. It's a very compelling tape. I will grant you that. This is a very compelling case. I think if the People wish to present it, I see no objection to it. In doing a[n Evidence Code section] 352 analysis, I think that it has more probative value than any prejudicial effect. I think what [the prosecutor] said, what this jury has heard from many other people makes this tape pale."

Some courts, although not all, have permitted the playing of video-tapes regarding the victim—but very cautiously. In *People v. Prince* (2007) 40 Cal.4th 1179 [57 Cal.Rptr.3d 543, 156 P.3d 1015], the trial court admitted as victim impact evidence a videotape of an approximately 25-minute interview with one of the murder victims conducted at a local television station. In addition, the court admitted victim impact evidence from several other witnesses. (*Id.* at p. 1209.) We found no prejudicial error. "Case law pertaining to the admissibility of videotape recordings of victim interviews in capital sentencing hearings provides us with no bright-line rules by which to determine when such evidence may or may not be used. We consider pertinent cases in light of a general understanding that the prosecution may present evidence for the purpose of ' "reminding the sentencer . . . [that] the victim is an individual whose death represents a unique loss to society" ' (*Payne v. Tennessee, supra,* 501 U.S. at p. 825), but that the prosecution may not introduce irrelevant or inflammatory material that ' "diverts the jury's attention from its proper role or invites an irrational, purely subjective response." ' (*People v. Edwards* [(1991)] 54 Cal.3d [787,] 836 [1 Cal.Rptr.2d 696, 819 P.2d 436].)" (*People v. Prince, supra,* at p. 1288.)

In *Prince,* we discussed cases that permitted the admission of videotapes. (*People v. Prince, supra,* 40 Cal.4th at p. 1288.) These included *Whittlesey v. State* (1995) 340 Md. 30 [665 A.2d 223] (90-second videotape of the victim playing the piano, stressing the deference afforded to the trial judge), *State v. Allen* (1999) 2000 NMSC 2 [128 N.M. 482, 994 P.2d 728] (three-minute videotape regarding the victim's life), and *State v. Gray* (Mo. 1994) 887 S.W.2d 369, 389 (videotape of the victim's family at Christmas). Additionally, *Hicks v. State* (1997) 327 Ark. 727 [940 S.W.2d 855] upheld the admission of a 14-minute videotape containing about 160 photographs of the victim, his family, and friends, and narrated by the victim's brother.

As we discussed in *People v. Prince, supra,* 40 Cal.4th at pages 1288–1289, two courts have not permitted the showing of videotapes. In *U.S. v. Sampson* (D.Mass. 2004) 335 F.Supp.2d 166, the trial court excluded a 27-minute videotape consisting of 200 photographs of the victim at various

stages of life set to "evocative contemporary music." (*Id.* at p. 191.) We described in detail the second case (*Salazar v. State* (Tex.Crim.App. 2002) 90 S.W.3d 330), the case defendant relies on most heavily in challenging the videotape here. "Reviewing facts that we characterized as 'extreme' (*People v. Robinson, supra,* 37 Cal.4th at p. 652), the Texas Court of Criminal Appeals disapproved of similar videotape evidence in *Salazar v. State, supra,* 90 S.W.3d 330, finding that in this noncapital case the trial court had abused its discretion in admitting a 17-minute videotape tribute to a murder victim. In remanding for an assessment of prejudice, the court stated in *Salazar* that 'the punishment phase of a criminal trial is not a memorial service for the victim' (*id.* at pp. 335–336) and that '[w]hat may be entirely appropriate eulogies to celebrate the life and accomplishments of a unique individual are not necessarily admissible in a criminal trial.' (*Id.* at p. 336.) The court complained that the trial court had not seen the videotape before it was played to the jury and consequently was unable to weigh the probative value of the tape against its prejudicial impact. (*Id.* at pp. 336–337.) The reviewing court emphasized the risk of unfair prejudice, noting the video contained many images from the adult victim's infancy and childhood. (*Id.* at pp. 337–338.)" (*People v. Prince, supra,* at p. 1289.)

We discussed *Salazar v. State, supra,* 90 S.W.3d 330, further in *Robinson*: "In that murder trial, the court admitted a 17-minute 'video montage' tribute to the murder victim—approximately 140 photographs set to emotional music, including 'My Heart Will Go On,' sung by Celine Dion and featured prominently in the film Titanic (20th Century Fox 1997). [Citation.] Reversing a lower appellate court decision finding the presentation admissible, the Texas Court of Criminal Appeals remanded for an assessment of prejudice. In so ruling, the state high court observed, among other things, that 'the punishment phase of a criminal trial is not a memorial service for the victim. What may be entirely appropriate eulogies to celebrate the life and accomplishments of a unique individual are not necessarily admissible in a criminal trial' [citation], and that '*we caution that victim impact and character evidence may become unfairly prejudicial through sheer volume.* Even if not technically cumulative, an undue amount of this type of evidence can result in unfair prejudice . . . . Hence, *we encourage trial courts to place appropriate limits upon the amount, kind, and source of victim impact and character evidence.*' [Citation.]" (*People v. Robinson, supra,* 37 Cal.4th at p. 652.)

We emphasized in *Prince* that "[c]ourts must exercise great caution in permitting the prosecution to present victim-impact evidence in the form of a lengthy videotaped or filmed tribute to the victim. Particularly if the presentation lasts beyond a few moments, or emphasizes the childhood of an adult victim, or is accompanied by stirring music, the medium itself may assist in creating an emotional impact upon the jury that goes beyond what the jury

might experience by viewing still photographs of the victim or listening to the victim's bereaved parents. . . . In order to combat this strong possibility, courts must strictly analyze evidence of this type and, if such evidence is admitted, courts must monitor the jurors' reactions to ensure that the proceedings do not become injected with a legally impermissible level of emotion." (*People v. Prince, supra*, 40 Cal.4th at p. 1289.)[5]

As noted, we found no prejudicial error in admitting the videotape in *Prince*. "Although we caution courts against the routine admission of videotapes featuring the victim, we do not believe that prejudicial error occurred under the circumstances of the present case. The videotaped evidence did not constitute ' "irrelevant information or inflammatory rhetoric that divert[ed] the jury's attention from its proper role or invite[ed] an irrational, purely subjective response." ' (*People v. Edwards, supra*, 54 Cal.3d at p. 836.) . . . [T]he videotaped interview of [the victim] did not constitute an emotional memorial tribute to the victim. There was no music, emotional or otherwise. The tape did not, as the trial court in the present case initially feared it might, display the victim in her home or with her family, nor were there images of the victim as an infant or young child. The setting was a neutral television studio, where an interviewer politely asked questions concerning the victim's accomplishments on the stage and as a musician and the difficulty she experienced in balancing her many commitments, touching only briefly upon her plan to attend college in the fall and follow the stage as a profession. If not for the circumstances of her subsequent murder, the videotape admitted at trial likely would be of modest interest to anyone apart from [the victim] and her friends and family. The loss of such a talented and accomplished person is poignant even for a stranger to contemplate, but the straightforward, dry interview depicted on the videotaped recording was not of the nature to stir strong emotions that might overcome the restraints of reason." (*People v. Prince, supra*, 40 Cal.4th at pp. 1289–1290.)

We also find no prejudicial error in this case. We have viewed the videotape. It lasts about 20 minutes. It consists of a montage of still photographs and video clips of Sara Weir's life, from her infancy until shortly before she was killed at the age of 19, narrated calmly and unemotionally by her mother. Throughout much of the video, the music of Enya—with most of the words unrecognizable—plays in the background; the music is generally soft, not stirring. One segment shows Sara singing a couple of songs with a school group, including "You Light Up My Life." Part of the time she was singing solo, with her mother explaining that every student was required to sing solo. The videotape concerns Sara's life, not her death. It shows scenes

---

[5] The first paragraph of the concurring and dissenting opinion transforms this "caution" into a "limitation." (conc. & dis. opn. of Moreno, J., *post*, at p. 802.) On the contrary, *People v. Prince, supra*, 40 Cal.4th 1179, stated no categorical rules.

of her swimming, horseback riding, at school and social functions, and spending time with her family and friends. The closest it comes to referring to her death is the mother's saying near the end, without noticeable emotion, that she does not want to dwell on this "terrible crime." There is no mention of the facts of the murder or of defendant. The video ends with a brief view of Sara's unassuming grave marker followed by a video clip of people riding horseback in Alberta, Canada, over which the mother says this was where Sara came from and was the "kind of heaven" in which she belonged.

Unlike the situation in *Salazar v. State, supra*, 90 S.W.3d 330, here the trial court watched the videotape and exercised its discretion. Moreover, this is not a case of one witness after another giving repetitive victim impact testimony. Only the victim's mother testified about the impact of Sara's murder. The videotape supplemented, but did not duplicate, the mother's testimony. For the most part, the videotape, including the mother's narrative, was not unduly emotional and presented material that was relevant to the penalty determination. It humanized Sara Weir, as victim impact evidence is designed to do. It contained a factual chronology of Sara's life, from her infancy to her death in early adulthood, which helped the jury to understand "the loss to the victim's family and to society which has resulted from the defendant's homicide." (*Payne v. Tennessee, supra*, 501 U.S. at p. 822.) In *People v. Prince, supra*, 40 Cal.4th at page 1289, we cautioned against a presentation that "emphasizes the childhood of an adult victim . . . ." That case did not involve childhood images, so we did not resolve the question. Here, the videotape did not emphasize any particular period of Sara's life but reviewed all of it. Doing so was relevant and, because the presentation was not unduly emotional, permissible.

In particular, the videotape helped the jury to see that defendant took away the victim's ability to enjoy her favorite activities, to contribute to the unique framework of her family—she was of Native American descent and adopted into a Caucasian home—and to fulfill the promise to society that someone with such a stable and loving background can bring. The videotape further illustrated the gravity of the loss by showing Sara's fresh-faced appearance before she died. In the videotape, Sara appears at all times to be reserved, modest, and shy—sometimes shunning the camera. Her demeanor is something words alone could not capture. Such images corroborated evidence at the guilt phase, that could be considered in aggravation of penalty, suggesting that defendant preyed on Sara's naïve and trusting nature. Jurors could reasonably, and relevantly, conclude that defendant, who betrayed and raped other young women, felt comfortable exercising the ultimate act of violence and control over someone as vulnerable as Sara. The viewer knew Sara better after viewing the videotape than before, but the tape expressed no outrage over her death, just implied sadness. It contained no clarion call for vengeance. It was longer than some tapes that have been admitted, but we see no

bright-line limit to how long a videotape may be. It is only slightly longer than the one admitted in *Hicks v. State, supra,* 940 S.W.2d 855, and is actually slightly shorter than the one admitted in *People v. Prince, supra,* 40 Cal.4th 1179.

Trial courts must be very cautious about admitting such videotape evidence. We have upheld the exclusion of evidence a defendant offers in mitigation that was irrelevant. (*People v. Monterroso* (2004) 34 Cal.4th 743, 778–779 [22 Cal.Rptr.3d 1, 101 P.3d 956] [trial court properly excluded as irrelevant documentary concerning the life of a street child in Guatemala]; *People v. Nye* (1969) 71 Cal.2d 356, 371–372 [78 Cal.Rptr. 467, 455 P.2d 395] [trial court properly excluded a film the defendant offered in mitigation that involved a paid professional actor].) Similarly, evidence offered in aggravation must be excluded if not relevant. In this regard, the rules are similar whether the evidence is offered in mitigation or in aggravation. When offered for either purpose, the evidence must be relevant to the penalty determination. Nonfactual dramatization of the evidence in a videotape—in the sense of making a presentation in a dramatic manner—adds irrelevant factors to the videotape. The videotape must factually and realistically portray the victim's life and character and not present a "staged and contrived presentation . . . ." (*People v. Nye, supra,* 71 Cal.2d at p. 371.) Trial courts must not permit irrelevant background music or video techniques that enhance the emotion of the factual presentation. Moreover, the videotape, even when presented factually, must not be unduly emotional. (*People v. Prince, supra,* 40 Cal.4th at pp. 1286–1287.)

In some respects, the videotape here might have contained irrelevant aspects. Music is not always impermissible. The portion of the videotape showing Sara's singing performance seems relevant to the purpose of demonstrating what she was like. It reflects her demeanor in the difficult situation her mother described—a shy girl performing solo before her classmates. Her choice of song to sing at that age and in those circumstances also seems relevant to forming an impression of the victim. Her musical performance was not excessively emotional. But the background music by Enya may have added an irrelevant factor to the videotape. It had no connection to Sara other than that her mother said it was some of Sara's favorite music. The Enya background music seems unrelated to the images it accompanied and may have only added an emotional element to the videotape. The portion at the end, showing a video clip of people riding horseback in Alberta, Canada, over which the mother says this was the "kind of heaven" in which Sara belonged, was also theatric without imparting any additional relevant material.

We need not decide whether the court abused its discretion in not ordering the videotape modified to exclude the Enya background music and the horseback riding scene at the end, for any error in this regard was not prejudicial. Most of the videotape was factual, relevant, and not unduly emotional, and the trial court had discretion to admit it. To the extent it contained aspects that were themselves emotional without being factual—the background music and the final portion, perhaps—we are confident that permitting the jury to view and hear those portions along with the rest of the mostly factual and relevant videotape was harmless in light of the trial as a whole. These days, background music in videotapes is very common; the soft music here would not have had a significant impact on the jury. We see no reasonable possibility these portions of the videotape affected the penalty determination or, to state the equivalent, any error was harmless beyond a reasonable doubt. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960–961 [44 Cal.Rptr.3d 237, 135 P.3d 649].)

Defendant also contends the victim impact evidence "creates an intolerable risk of improper comparisons between the victim and the defendant." Nothing in the record, however, shows that such a comparison was made in this case. Defendant also asserts that the evidence created "the danger that racial discrimination will affect the jury's decision." The claim is specious. Nothing in the videotape, Sara's mother's testimony, the prosecutor's argument to the jury, or anything else in this trial suggested the jury should impose the death penalty for racial reasons.

## 2. *Refusal to Give Defendant's Requested Jury Instructions*

Defendant contends the court erred in refusing to give special instructions the defense requested at trial that would have told the jury that it need not be unanimous to consider mitigating evidence, that it had the power to choose the sentence of life solely to show mercy, and that a single mitigating factor could outweigh a number of aggravating factors. The court did not err. As we have repeatedly explained, the standard jury instructions the court gave in this case "are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1176–1177 [74 Cal.Rptr.2d 121, 954 P.2d 384], and cases cited; see also *People v. Smith* (2003) 30 Cal.4th 581, 638 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Breaux* (1991) 1 Cal.4th 281, 314–315 [3 Cal.Rptr.2d 81, 821 P.2d 585].) No additional instructions were required.

### 3. *Failure to Provide Intercase Proportionality Review*

Defendant contends California's death penalty law is invalid because it does not provide for intercase proportionality review. We disagree. (*Pulley v. Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871]; *People v. Mincey* (1992) 2 Cal.4th 408, 476 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Although we do not provide *intercase* proportionality review, we "do undertake *intracase* proportionality review to determine whether the penalty is disproportionate to defendant's personal culpability." (*People v. Steele, supra,* 27 Cal.4th at p. 1269.) Defendant does not specifically request intracase proportionality review, but it would not aid him. A serial rapist, he repeatedly threatened to kill his victims. Finally, he did kill one. Acting entirely by himself and for his own purposes, he stabbed to death Sara Weir, a naïve and trusting girl who had befriended him. Then he left the body under the bed of the 10-year-old son of his former girlfriend (who herself had become another of his victims) for that young child to discover. "[T]he sentence of death is not disproportionate to defendant's personal culpability. It does not shock the conscience." (*Ibid.*)

### 4. *Other Penalty Contentions*

Defendant reiterates many contentions we have repeatedly rejected. "The jury need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes), that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate penalty. [Citations.] The death penalty statute is not unconstitutional for failing to provide the jury with instructions of the burden of proof and standard of proof for finding aggravating and mitigating circumstances in reaching a penalty determination." (*People v. Morrison* (2004) 34 Cal.4th 698, 730–731 [21 Cal.Rptr.3d 682, 101 P.3d 568].) Recent United States Supreme Court decisions do not undermine these conclusions. (*People v. Stevens* (2007) 41 Cal.4th 182, 212 [59 Cal.Rptr.3d 196, 158 P.3d 763]; *People v. Morrison, supra,* at p. 731.) The court need not "instruct the jury on the presumption of life." (*People v. Prieto, supra,* 30 Cal.4th at p. 271.) CALJIC No. 8.88, which the court gave, properly instructs the jury on its sentencing discretion and the nature of its deliberative process. (*People v. Prieto, supra,* at p. 264; *People v. Millwee* (1998) 18 Cal.4th 96, 161–165 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1242–1244 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Section 190.3, factor (a), is not unconstitutionally overbroad, arbitrary, capricious, or vague. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1165 [40 Cal.Rptr.3d 118, 129 P.3d 321].) The jury's consideration of unadjudicated criminal conduct in aggravation is constitutional, and jury unanimity regarding such conduct is not required. (*People v. Brown* (2004) 33

Cal.4th 382, 402 [15 Cal.Rptr.3d 624, 93 P.3d 244].) The trial court need not delete section 190.3's sentencing factors that may not apply. (*People v. Schmeck* (2005) 37 Cal.4th 240, 305 [33 Cal.Rptr.3d 397, 118 P.3d 451].) The trial court need not instruct the jury which factors it may consider only in mitigation. (*People v. Maury, supra,* 30 Cal.4th at pp. 443–444.) The use of such adjectives in the sentencing factors as "extreme" (§ 190.3, factors (d), (g)) and "substantial" (*id.,* factor (g)) is constitutional. (*People v. Avila* (2006) 38 Cal.4th 491, 614–615 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) Equal protection principles do not require this court to give capital defendants the same sentence review afforded other felons under the determinate sentencing law. (*People v. Cox* (2003) 30 Cal.4th 916, 970 [135 Cal.Rptr.2d 272, 70 P.3d 277].)

### 5. *Violation of International Law*

Contrary to defendant's contention, a sentence of death that complies with state and federal constitutional and statutory requirements does not violate international law. (*People v. Tafoya* (2007) 42 Cal.4th 147, 199 [64 Cal.Rptr.3d 163, 164 P.3d 590].)

### 6. *Effect of Alleged Error*

Defendant contends that if either special circumstance finding is reversed, we must reverse the death judgment, and that the cumulative effect of the alleged errors was prejudicial. However, we have reversed neither special circumstance, and we have found no error to cumulate.

### III. CONCLUSION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Concurring.—The determination whether and to what extent to admit a videotape of the victim's life at the penalty phase of a capital case is within the sound discretion of the trial court. Nevertheless, as the majority recognizes (maj. opn., *ante,* at p. 796), we have previously cautioned courts against the "routine admission of videotapes featuring the victim." (*People v. Prince* (2007) 40 Cal.4th 1179, 1289 [57 Cal.Rptr.3d 543, 156 P.3d 1015].) We have recognized the "strong possibility" that a presentation that "lasts beyond a few moments, or emphasizes the childhood of an adult victim, or is accompanied by stirring music . . . itself may assist in creating an emotional impact upon the jury that goes beyond what the jury might experience by viewing still photographs of the victim or listening to

the victim's bereaved parents." (*Ibid.*) For this reason, trial courts "must exercise great caution in permitting the prosecution to present victim-impact evidence in the form of a lengthy videotaped or filmed tribute to the victim." (*Ibid.*)

Insofar as the majority opinion, consistent with our pronouncement in *Prince*, stands for the proposition that it is an abuse of discretion to admit a videotape that is unduly lengthy, has elements of theatricality in the use of evocative music and visions of the victim's place in the hereafter, and goes beyond a factual presentation of the victim as she was in life, I concur. Such was the videotape in this case. As Justice Moreno observes in his separate opinion, it was more akin to a eulogy than to conventional victim-impact evidence. (Conc. & dis. opn. of Moreno, J., *post*, at p. 805.) The trial court therefore erred in admitting it without requiring that it be modified.

For the reasons stated by both the majority opinion and Justice Moreno, however, I conclude admission of the videotape in its entirety was nonprejudicial. I therefore concur in the court's judgment.

**MORENO, J.,** Concurring and Dissenting.—"Courts must exercise great caution in permitting the prosecution to present victim-impact evidence in the form of a lengthy videotaped or filmed tribute to the victim. Particularly if the presentation lasts beyond a few moments, or emphasizes the childhood of an adult victim, or is accompanied by stirring music, the medium itself may assist in creating an emotional impact upon the jury that goes beyond what the jury might experience by viewing still photographs of the victim or listening to the victim's bereaved parents. . . . In order to combat this strong possibility, courts must strictly analyze evidence of this type and, if such evidence is admitted, courts must monitor the jurors' reactions to ensure that the proceedings do not become injected with a legally impermissible level of emotion." (*People v. Prince* (2007) 40 Cal.4th 1179, 1289 [57 Cal.Rptr.3d 543, 156 P.3d 1015].) In this case, the videotaped eulogy to Sara Weir played for the jury at the penalty phase of defendant's trial exceeded every limitation that this court unanimously set forth in *Prince*. For that reason, I disagree with the majority's conclusion that the videotape was admissible, albeit with "irrelevant aspects." (Maj. opn., *ante*, at p. 798.) In my view, the tape was inadmissible in its entirety and it was error for the trial court to have admitted it. I further conclude, however, that the error does not require reversal.

In holding that the Eighth Amendment "erects no *per se* bar" to the admission of victim impact evidence, the Supreme Court spoke about two types of evidence; evidence that gives the jury " 'a quick glimpse of the life' which a defendant 'chose to extinguish,' [citation]," and evidence that "demonstrat[es] the loss to the victim's family and to society which has

resulted from the defendant's homicide." (*Payne v. Tennessee* (1991) 501 U.S. 808, 827, 822 [115 L.Ed.2d 720, 111 S.Ct. 2597].)[1] The videotape in this case did not fall into the latter category. The impact of the victim's death on her family was presented at length through her mother's testimony before the videotape was played. Thus, the videotape falls into the second category described by *Payne*, but it went far beyond providing the jury with the "quick glimpse" of Sara's life necessary to establish her unique individuality. Rather, it contained material, and was produced in such a fashion, as to potentially imbue the proceedings with a "a legally impermissible level of emotion." (*People v. Prince, supra*, 40 Cal.4th at p. 1289.)

As the majority notes, we discussed the issue of the use of videotape victim impact evidence in *Prince* where, in response to the defendant's mitigation evidence, the prosecution introduced a 25-minute videotape of a television interview with one of the defendant's victims, Holly Tarr. (*People v. Prince, supra*, 40 Cal.4th at p. 1209.) In light of the specific characteristics of that videotape, we rejected the defendant's claim that it went beyond the constitutional limits of permissible victim impact evidence. We noted that the interview was filmed by a local news station that was doing profiles "of certain successful local high school students" a few months before the murder. (*Ibid.*) "The trial court *excluded* portions of the videotape depicting Tarr's musical performances, because it determined that this evidence would be cumulative. The interviewer devoted nearly the entire interview to Tarr's training and interest in acting and singing, adding a few questions concerning Tarr's ability to balance school and artistic commitments. The tape recording exhibits a young female interviewer and Tarr, seated in chairs in front of a plain backdrop. There is no music and there are no cuts to other images of Tarr—the interview is a calm, even static, discussion of Tarr's accomplishments and interests that takes place entirely in a neutral, bland setting. Under ordinary circumstances, the two young women's discussion would appear unlikely to invite empathy or emotional response." (*Id.* at p. 1287.)

We concluded our discussion in *Prince* with the cautions to which I refer at the outset of this opinion regarding the admission of videotaped victim

[1] I am concerned also that in this case defendant did not introduce any mitigating evidence at the penalty phase because an analytic linchpin of the Supreme Court's analysis in *Payne* was the premise that the state " 'has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Payne v. Tennessee, supra*, 501 U.S. at p. 825; see *People v. Prince, supra*, 40 Cal.4th at p. 1286.) Of course, victim impact evidence is not rendered inadmissible simply because a defendant chooses not to put on evidence in mitigation, but where, as here, the defendant makes clear that he or she is not going to present such evidence, the trial court should exercise greater caution in admitting victim impact evidence so as to avoid the possibility of "piling on" such evidence to the point that it does become unfair.

impact evidence which is, in effect, a "filmed tribute to the victim" that lasts "beyond a few moments," or "emphasizes the childhood of an adult victim" or is "accompanied by stirring music . . . ." (*People v. Prince, supra,* 40 Cal.4th at p. 1289.) In our analysis, we considered and distinguished two other cases in which victim impact videotapes had been excluded or found prejudicial, *U.S. v. Sampson* (D.Mass. 2004) 335 F.Supp.2d 166 and *Salazar v. State* (Tex.Crim.App. 2002) 90 S.W.3d 330.

In *U.S. v. Sampson, supra,* 335 F.Supp.2d 166, the district court, in explaining why it excluded a 27-minute videotape containing 200 still photographs of the victim set to evocative contemporary music, including that of the Beatles and James Taylor, explained: "[A]dmission of the video would have been unfairly prejudicial in light of the fact that the jury heard powerful, poignant testimony about Jonathan Rizzo's full life and the impact of his loss on his family, and saw photographs of him in conjunction with this testimony. The video, given its length and the number of photos displayed, would have constituted an extended emotional appeal to the jury and would have provided much more than a 'quick glimpse' of the victim's life. Together with the evocative accompanying music, the videotape's images would have inflamed the passion and sympathy of the jury." (*Id.* at pp. 192–193.)

In *Salazar v. State, supra,* 90 S.W.3d 330, the murder victim was a 20-year-old man, Jonathon Bishop. In rebuttal to mitigation evidence, the victim's mother testified briefly as to impact of his death. His father also testified, but primarily to lay the foundation for the admission of a "seventeen-minute video montage of photographs depicting the murder victim's life." (*Id.* at p. 332.) According to the Texas Criminal Court of Appeals: "This video is an extraordinarily moving tribute to Jonathon Bishop's life. It consists of approximately 140 still photographs, arranged in a chronological montage. Music accompanies the entire seventeen-minute video and includes such selections as 'Storms in Africa' and 'River' by Enya, and concludes with Celine Dion singing, 'My Heart Will Go On,' from the movie *Titanic*. [¶] Almost half of the approximately 140 photographs depict the victim's infancy and early childhood." (*Id.* at p. 333.)

In explaining why the tape was inadmissible, the court said: "Nearly half of the photographs showed Jonathon Bishop as an infant, toddler or small child, but appellant murdered an adult, not a child. He extinguished Jonathon Bishop's future, not his past. The probative value of the vast majority of these 'infant-growing-into-youth' photographs is *de minimis*. However, their prejudicial effect is enormous because the implicit suggestion is that appellant murdered this angelic infant; he killed this laughing, light-hearted child; he snuffed out the life of the first-grade soccer player and of the young boy hugging his blond puppy dog. . . . While the probative value of one or two

photographs of an adult murder victim's childhood might not be substantially outweighed by the risk of unfair prejudice, what the State accurately characterizes as a 'seventeen-minute montage' of the victim's entire life is very prejudicial both because of its 'sheer volume,' and because of its undue emphasis upon the adult victim's halcyon childhood." (*Salazar v. State, supra,* 90 S.W.3d at p. 337.)

The videotape admitted here was in part strikingly similar to the tape found inadmissible in *Salazar,* and, where it differed, was precisely the kind of tape that we warned against admitting in *Prince.* First, the parallels: like the victim in *Salazar,* who was 20 years old, Sara Weir, at age 19 years, was a very young adult, but an adult nonetheless who had left home and was living on her own. However, like the video montage in *Salazar,* the videotape of Sara's life is chronological and dwells on her childhood in a series of evocative scenes (swimming, getting ready for Halloween, with her cat, Smokey). Both videos are even set in part to the same type of music, from the performer, Enya.

However, while the video montage of Jonathon Bishop in *Salazar* consisted of still photographs, the videotape in this case included considerable video footage of scenes from Sara's life with sound. Thus, at one point, Sara is shown as a young teenager at her junior high school's talent show singing a solo of the song, "You Light Up My Life." Finally, after a closeup of Sara's grave, the videotape ends with what is apparently stock footage, depicting a lone horseman riding against a range of mountains, with the comment by Sara's mother that this is the kind of heaven in which she imagines her daughter. Thus, this videotape was longer than the videotape found inadmissible in *Salazar,* contained video footage and not merely still photographs, was accompanied by evocative music more appropriate to a memorial service, and concluded on a frankly religious note.

If the cautions we expressed regarding this type of evidence in *Prince* have any application at all, they must apply to this case. As the court in *Salazar* correctly pointed out, "the punishment phase of a criminal trial is not a memorial service for the victim. What may be entirely appropriate eulogies to celebrate the life and accomplishments of a unique individual are not necessarily admissible in a criminal trial." (*Salazar v. State, supra,* 90 S.W.3d at pp. 335–336.) The videotape in the present case is akin to a eulogy, and should therefore not have been admitted as victim impact evidence.

Having so concluded, however, I further conclude that the error was not prejudicial. Given the extensive and affecting testimony of the victim's mother, the videotape was, at most, cumulative to that testimony. I cannot say that this additional evidence so inflamed the passions and the sympathy of the jury that the penalty phase was rendered unfair.

Appellant's petition for a rehearing was denied February 20, 2008, and the opinion was modified to read as printed above.