Filed 7/10/14  P. v. Steele CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL STEELE,<br><br>　　　　Defendant and Appellant. | A133463<br><br>(San Francisco County<br>Super. Ct. No. 213467) |

Michael Steele appeals from convictions of selling heroin and possessing heroin for sale.  He contends that the trial court erred in admitting evidence of a prior uncharged act of selling heroin without weighing its probative value against its prejudicial effect, and that insufficient evidence supports his convictions.  He further contends he is entitled to additional presentence conduct credit under constitutional principles of equal protection.  We reject these contentions.  Furthermore, we conclude the trial court in fact awarded more presentence conduct credits than were authorized by the governing statute.  Accordingly, we direct that the abstract of judgment be corrected to reflect a total of 684 presentence credits and affirm the judgment as so corrected.

**STATEMENT OF THE CASE**

Appellant was charged by an amended information filed on December 2, 2010, with one count of selling heroin (Health & Saf. Code, § 11352, subd. (a)[1]), and one count of possession of heroin for sale (§ 11351).  The information alleged two prior convictions

---

[1] Further statutory references will be to the Health and Safety Code unless otherwise specified.

1

for selling a controlled substance (May 2004 and November 2009) and three prior convictions for possession for sale of a controlled substance (November 2009, September 1985 and December 1992) as rendering appellant ineligible for probation (§ 11370, subds. (a) and (c), Pen. Code, §§ 1203, subd. (e)(4)), 1203.07, subd. (a)(3)), and subjecting him to sentence enhancement (§ 11370.2; Pen. Code, § 1203.07, subd. (a)(3). A 1980 robbery conviction was alleged as a prior serious felony conviction (Pen. Code, §§ 667, subds. (d) & (e), 1170.12, subds. (b) & (c)), as well as one of the priors making appellant ineligible for probation under Penal Code section 1203, subdivision (e)(4). Finally, it was alleged that appellant served separate prison terms for each of the five alleged controlled substance priors.  (Pen. Code, § 667.5, subd. (b).)

On February 10, 2011, a jury found appellant guilty of the two charged offenses. Appellant waived jury trial on the alleged priors, and on February 14, the court found true four of the alleged controlled substance priors (excluding the September 1985 conviction, which the prosecution stated it was unable to prove) for purposes of 11370.2 and Penal Code section 667.5, subdivision (b), and found true the robbery conviction allegation under Penal Code section 1170.12.

Appellant filed a motion to strike the strike prior; at the sentencing hearing on August 17, the prosecutor concurred and moved to strike the strike, and the court granted the motion.  The court sentenced appellant to a total prison term of 14 years, consisting of the aggravated term of five years on each of counts 1 and 2, to run concurrently, plus consecutive three-year enhancements pursuant to section 11370.2 for the 2004 and 2009 section 11352 priors and the 1992 section 11351 prior.  The court exercised its discretion under Penal Code section 1385 to strike the 2009 Health and Safety Code section 11351 prior.  Appellant was awarded a total of 912 presentence custody credits, reflecting 456 actual days of custody and 456 conduct credits.  The abstract of judgment was filed on August 29, 2011. [2]

---

[2] The court's August 17 minutes and the abstract of judgment filed on August 29, 2011, erroneously indicate that the three-year enhancements were imposed under Penal

On September 1, 2011, appellant filed a request for resentencing under Penal Code section 1170, subdivision (d). After a hearing on December 12, the court denied appellant's request.

Appellant filed his notice of appeal on October 11, 2011.

## STATEMENT OF FACTS

About 11:23 a.m. on September 6, 2010, San Francisco Police Officer John Fergus was conducting narcotics surveillance in the Tenderloin District, a high-crime area with an extremely high level of narcotics activity and significant violence, a lot of it due to the narcotics trade. Observing the southeast corner of Turk and Leavenworth, Fergus saw appellant standing in front of 156 Leavenworth and watched him for approximately four minutes. Appellant was facing the street, looking up and down and talking to different people as they walked by. Fergus saw a white male subsequently identified as Stoneking approach appellant and engage in conversation for less than a minute. He then saw Stoneking hand appellant a piece of currency, which appellant put in his left pocket, and saw appellant remove from his right front pants pocket a black tar-like substance wrapped in plastic that Fergus believed to be heroin. Appellant displayed the substance in his right hand to Stoneking, then placed a piece smaller than a dime in Stoneking's hand and put the rest back in his pocket. Fergus advised the arrest team, which moved in to make an arrest. Meanwhile, Stoneking walked quickly around the corner, heading east on Turk Street, and appellant walked south on Leavenworth. Appellant was arrested by Officers MacMahon and Basurto just south of 144 Leavenworth. Fergus testified that he saw the transaction from less than 20 yards away and, because his observation point was elevated, he had an unobstructed view; he did not have binoculars but did not need them

---

Code section 667.5, subdivision (b). Penal Code section 667.5, subdivision (b), provides for *one-year* enhancements for prior prison terms. The reporter's transcript makes clear that the three-year enhancements were imposed under section 11370.2, and the court stayed all of the Penal Code section 667.5, subdivision (b), priors. An amended abstract of judgment filed on January 9, 2012, as well as amended court minutes from August 17, correctly reflect that the enhancements were imposed under Health and Safety Code section 11370.2.

to see clearly. Fergus testified that he did not lose sight of appellant between the transaction and appellant's arrest. He did not see appellant take out a wallet and put the loose money into it, and Fergus could not identify specific money in appellant's possession as having come from Stoneking.

Officer Mark Hodge, who was on foot in the area, heard on the radio that officers were looking for a suspect and saw a person who matched the description running toward him. Hodge detained the person, verbally identified him as Stoneking, and other officers, including Fergus, arrived and confirmed he was the suspect. Fergus testified that about four to five minutes passed from the time appellant was arrested and he left his point of observation to the time Stoneking was arrested. The piece of narcotics Stoneking was suspected to have obtained from appellant was not recovered.

Officer MacMahon testified that when he searched appellant he found two bindles of suspected heroin in appellant's right front pocket. One of these bindles was subsequently tested and found to contain 0.32 grams of heroin. MacMahon did not recall whether he recovered money from appellant. Fergus testified that appellant had $106 in his possession, which was not identified as evidence relating to the criminal transaction but was booked in as appellant's personal property; he did not recall whether MacMahon told him the money was found in appellant's pocket or in his wallet.[3] MacMahon

---

[3] Appellant states that no cash was taken from his pocket at the time of his arrest and all of the money booked was found in his wallet. His citations to the record do not support his statement. The testimony cited as showing no cash was found in appellant's pocket is Fergus's testimony on cross-examination that he was not able to identify specific money related to the transaction with Stoneking, that the money booked as appellant's personal property included "[s]ome which he received from Stoneking," and that Fergus did not "identify specific money that was found in [appellant's] pocket from Stoneking." The testimony cited to show all the money booked was in appellant's wallet is Fergus's testimony that while he had a constant view of appellant from the transaction through the arrest, he saw appellant put the money Stoneking gave him into his pocket and did not see appellant take out a wallet and put loose money into it. In fact, the testimony never established where the $106 found in appellant's possession was located, only that all the money in his possession was together. The inmate property inventory report generated when appellant was booked, which was introduced as an exhibit at trial,

4

testified that generally, if there was money relating to a criminal investigation, it would be identified in a police report and not characterized as the individual's personal property. Fergus acknowledged on cross examination that one of the most important facts in a hand-to-hand observation is identification of the drugs and the money.

Officer William Scott, who had 18 years experience in the narcotics division, testified that a narcotics user would usually have some sort of drug paraphernalia, such as a syringe or Visine bottle for snorting, on his or her person, and that it was common for users to also sell narcotics. Scott testified that the description at trial of the 2008 drug transaction was a common scenario. He described the usual drug transaction as one in which the seller remains stationary and is approached by the buyer, who leaves the area after the exchange of money for drugs. Another common scenario involves a "hook" who finds a person who wants to purchase narcotics and takes that person to the seller, who is often in a stationary position, and is compensated for each transaction.

Scott testified that Fergus's testimony led him to believe appellant was at the location for the purpose of selling narcotics based on the location, which is well known for narcotics sales, and the facts that appellant was at the location for four or five minutes, displayed several pieces of suspected tar heroin to the potential buyer, and gave the purchaser the suspected narcotics after the purchaser gave appellant currency. Scott opined that the two pieces of heroin found in appellant's pocket were possessed for the purpose of sale based on the facts that no drug paraphernalia was seized and put into evidence, while a user would usually be in possession of such paraphernalia. Scott's opinion that the heroin in appellant's pocket was possessed for sale was also influenced by the evidence of a 2008 transaction in which appellant furnished an undercover officer

lists "black wallet, no cash" as one item and "$106" as a separate item. In closing argument, the prosecutor made a point of these items being listed separately, while the defense argued that the money was taken out of the wallet as part of the standard inventory procedure and not put back in because it followed appellant to jail for his use there. No evidence presented at trial actually established either side's interpretation of the inventory list.

with narcotics and then attempted to discard narcotics. Additionally, the packaging of the heroin recovered from appellant—two separate packages in the same wrapping material—was consistent with selling narcotics.

Scott testified that according to San Francisco Police Department protocol, if an arrestee is in possession of $300 to $500, the money would be seized and booked into evidence; for lesser amounts, the money would be documented but treated as the arrestee's property rather than booked into evidence. The fact that appellant was in possession of $106 was a factor in Scott's opinion that appellant possessed the narcotics for sale because Fergus observed the buyer provide appellant with currency; the officers were unable to determine which was appellant's personal money and which came from the transaction because the money was comingled. Scott stated, however, that even if comingled, the money should have been reflected in the narrative of the police report, and the report in this case did not identify any money specifically obtained in the drug transaction. Scott acknowledged that appellant had a lighter in his possession and that a lighter could be used to assist in ingesting heroin by softening it to be able to snort it through a Visine bottle or to inject it, or, rarely, to heat it on aluminum foil and inhale the fumes. Shown appellant's mug shot from September 6, 2010, Scott acknowledged that appellant's eyes appeared red and watery and his eyelids droopy, and that it was possible he was under the influence of an opiate or alcohol, although he could not tell from the photograph whether this was the case and he did not know factors such as how much appellant had slept the night before or whether he was upset at being arrested.

Police Officer Michael Browne testified about an occasion on the evening of June 12, 2008, when he was working undercover in the Tenderloin, attempting to purchase drugs from street-level dealers. A person named "King" approached Browne on the 100 block of Leavenworth Street and asked what he was looking for. Browne said he was looking for heroin, using a street term. King asked if Browne was a police officer and Browne said he was not, then King said he needed to go up the street to get the heroin. Browne watched King walk about half a block to the southeast corner of Turk and Leavenworth, where he met with appellant. Appellant had a plastic bag which he

6

appeared to give to King. King returned to Browne and gave him what Browne believed to be heroin, and Browne gave King $20 in marked city funds. Officer Derrick Jackson moved in to arrest appellant, who attempted to walk past him and dropped two items to the ground. The first was the marked $20 bill and the second was a clear plastic baggie containing several off-white rocks and three individual bindles of heroin. Browne testified that in his experience, some people who use narcotics also sell narcotics, and some dealers use users to hold narcotics.

At the conclusion of the prosecution's case, appellant moved for a directed acquittal on count 1, on the ground that without any heroin recovered from Stoneking, there was insufficient evidence appellant sold heroin. This motion was denied. The defense did not present any witnesses.

<h2 style="text-align:center">DISCUSSION</h2>

<h3 style="text-align:center">I.</h3>

Appellant first contends the trial court committed prejudicial error by failing to exercise its discretion under Evidence Code section 352 to weigh the probative value of the evidence of the 2008 drug sale against its prejudicial effect before admitting the evidence. He argues the evidence was unduly prejudicial and its admission infected the proceedings by permitting the prosecution to prove its case primarily through impermissible character evidence, resulting in a fundamentally unfair trial that violated appellant's constitutional rights.

The prosecution's trial brief included a motion in limine to allow evidence under Evidence Code section 1101, subdivision (b), of three uncharged prior incidents of appellant selling narcotics: A June 12, 2008 arrest for violation of sections 11352 and 11351 involving a sale of heroin to an undercover officer and resulting in a guilty plea and three year prison sentence; a December 8, 2003 arrest for violation of sections 11351 and 11352, involving sale of cocaine to an undercover officer; and a July 19, 2002 arrest for violation of section 11352, involving sales of cocaine observed by surveillance officers. The prosecution argued these priors were admissible to show appellant's intent to sell in the present case, knowledge that the substance was a controlled substance, and

7

common plan or scheme to sell a controlled substance. The motion noted that before admitting such evidence, the court would have to determine that its probative value outweighed its prejudicial effect.

At the same time, the defense moved to exclude evidence of these three incidents as more prejudicial than probative, based on police officer testimony that lacked foundation, and lacking proof of reliable chemical testing to demonstrate the items involved in the incidents were confirmed to be narcotics.

At the hearing on these motions, the prosecutor argued that the 2008 incident was probative on the issue of intent and common plan or scheme, and very similar to the current offense as it involved sale of the same substance on the same block as in the present case. The defense argued that the prosecution should not be permitted to establish the nature of the substance in the prior incident by opinion testimony; any documentation of laboratory testing should be provided to the defense; and in any event there were credibility problems with testing by the San Francisco Crime Laboratory at that time. The defense argued that permitting evidence of the 2008 incident would allow the jury "to fill in gaps of the current case," in which the alleged buyer was not found in possession of any contraband. The court ruled that provided the prosecution could present competent evidence, the 2008 incident appeared to be admissible under Evidence Code section 1101, subdivision (b), as "important evidence that is more probative than prejudicial." The court further ruled that if the prosecution could prove the 2008 incident, the other two prior incidents would be unnecessary and possibly inappropriate as unduly time consuming.

An Evidence Code 402 hearing on the 2008 incident was held on February 4, 2011. Police Officer Browne testified about the his undercover purchase from appellant and the items dropped by appellant and retrieved by Officer Jackson, his training and experience in investigating heroin cases, including his familiarity with the appearance, smell and texture of heroin and his reasons for believing the substance he purchased from appellant was heroin. Jackson testified about retrieving the baggie and money appellant dropped and showing these items to Browne at the police station. The court ruled that

8

the evidence of the 2008 incident would be admissible if the prosecution could provide evidence connecting the police officers' testimony to appellant's conviction in the case, as the conviction would demonstrate heroin was in fact involved.

"Evidence Code section 1101, subdivision (a) generally prohibits the admission of evidence of a prior criminal act against a criminal defendant 'when offered to prove his or her conduct on a specified occasion.' Subdivision (b) of that section, however, provides that such evidence is admissible when relevant to prove some fact in issue, such as motive, intent, knowledge, identity, or the existence of a common design or plan.

" 'The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' (*People v. Carpenter* (1997) 15 Cal.4th 312, 378-379.) Evidence may be excluded under Evidence Code section 352 if its probative value is 'substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (*People v. Harrison* (2005) 35 Cal.4th 208, 229.) 'Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value.' (*People v. Kelly* (2007) 42 Cal.4th 763, 783.)" (*People v. Lindberg* (2008) 45 Cal.4th 1, 22-23.)

" 'The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] "[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . ." (2 Wigmore, [Evidence] (Chadbourn rev. ed. 1979) § 302, p. 241.) In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.]" [Citation.]' " (*People v. Kelly*, *supra*, 42 Cal.4th at pp. 783-784, quoting *People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

9

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) The trial court's decision "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Appellant urges that deference is not appropriate in this case because the trial court failed to follow proper procedures in that it failed to perform the required Evidence Code section 352 weighing of prejudice and probative value (see, *People v. Green* (1980) 27 Cal.3d 1, 25-27) and failed to consider all the material facts in evidence. (See, *In re Cortez* (1971) 6 Cal.3d 78, 85-86 ["To exercise the power of judicial discretion all the material facts in evidence must be both known and considered, together also with the legal principles essential to an informed, intelligent and just decision"].)

The record makes clear, however, that the court *did* engage in the required weighing process. As described above, when it first addressed the issue raised by the parties motions in limine, the court expressly concluded that if the prosecution could provide competent evidence of the 2008 incident, it would be "important" evidence and "more probative than prejudicial." The Evidence Code section 402 hearing was then devoted to a determination whether the prosecution would be able to prove the incident, and the court was ultimately convinced that it be able to do so. That the court did not *again* consider the admissibility of the evidence under Evidence Code section 352 is of no moment: The court had already determined that the evidence—provided it could be established—was both admissible under Evidence Code section 1101, subdivision (b), and more probative than prejudicial under Evidence Code section 352.

The remaining question is whether the court abused its discretion in so determining the issues. The probative value of the prior offense evidence is obvious: Appellant was convicted of selling the same controlled substance to an undercover agent in a street sale in virtually the same location as the present case. There can be no question that this prior offense was sufficiently similar " 'to support the inference that

10

[appellant] " 'probably harbor[ed] the same intent in each instance.' [Citations.]"
[Citation.]' " (*People v. Kelly, supra,* 42 Cal.4th at pp. 783-784, quoting *People v. Ewoldt, supra,* 7 Cal.4th at p. 402.)

Appellant contends the evidence was highly prejudicial because the very similarity of the prior offense made it likely the jury would prejudge appellant as a small-time dealer selling heroin to support his own addiction and convict him on this basis. His essential argument is that the evidence in the present case—absent this prior—was extremely weak and, therefore, the significance of the prior offense correspondingly greater. (*People v. Felix* (1993) 14 Cal.App.4th 997, 1008.) As will be discussed later in this opinion, appellant believes the evidence did not support his present conviction for selling heroin because, in his view, there was no proof the substance he was seen giving to Stoneking was heroin, no heroin was recovered, and it was never established that any of the money in appellant's possession came from Stoneking. Accordingly, appellant urges that the facts underlying count 1 could not support an inference of intent to sell with respect to the heroin found in appellant's possession and tested (the subject of count 2, possession for sale), and, without the evidence of the 2008 offense, there was no basis for concluding the heroin found in appellant's pocket was intended for sale rather than personal use. In this regard, he notes the suggestion raised by the defense at trial that he was intoxicated at the time of the transaction at issue here. Appellant stresses that the prosecutor placed great emphasis at trial on the 2008 evidence, and argues that the prior incident was in fact the *only* evidence presented to demonstrate appellant's intent with respect to the heroin found in his possession.

As we will explain in responding to appellant's claims of insufficiency of the evidence, we do not view the prosecution's case as weak. Fergus, an experienced narcotics officer, directly observed appellant exchange a substance Fergus recognized as heroin for money from Stoneking. Although the substance sold to Stoneking was not recovered, one of the remaining bindles was tested and confirmed to be heroin. As part of the sale Fergus observed, appellant displayed several bindles to Stoneking, then put what he did not sell back in his pocket. This transaction was strong evidence of the intent

11

with which appellant possessed the confirmed heroin that was in his possession upon his arrest.

To be sure, evidence of the 2008 sale of heroin added to the picture presented to the jury: As we have said, it was probative evidence of appellant's intent to sell heroin. The prosecutor, in argument, and the expert witness, in explaining the basis of his conclusions, discussed the prior incident as bearing on appellant's intent in the present case. But the fact that this evidence strengthened the prosecution's case did not make it unduly prejudicial within the meaning of Evidence Code section 352. " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' (*People v. Yu* (1983) 143 Cal.App.3d 358, 377.)" (*People v. Bolin* (1998) 18 Cal.4th 297, 320.) " 'Evidence Code section 352 requires the exclusion of evidence only when its probative value is substantially outweighed by its prejudicial effect. "Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." ' (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.)" (*People v. Jones* (2013) 57 Cal.4th 899, 948-949.)

Contrary to appellant's portrayal, the trial court clearly considered the issues involved in a proper Evidence Code section 352 determination. The court admitted the 2008 incident, which shared so many similarities with the present offense that its probative value on the question of intent was obvious. At the same time, the court declined to admit evidence of two other potentially relevant incidents, the 2002 and 2003 cocaine sales that the prosecution had sought to admit, thereby limiting the extent to which the jury would be informed of appellant's prior conduct. In finding the probative value of the evidence was not substantially outweighed by its prejudicial effect, the court's discretion was not exercised in an "arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez, supra,* 20 Cal.4th at pp. 9-10.)

12

Further, the jury was given the appropriate limiting instructions that it could consider evidence of the 2008 incident only for the purpose of evaluating whether the prosecution had met its burden of proof that appellant knew of the presence and character of the substance in the present case and intended to sell it, and that it could not use the prior offense evidence to conclude that appellant was a person of bad character or inclined to commit crimes and therefore probably committed the presently charged crime. These instructions were given after presentation of evidence concerning the 2008 incident and again as part of the court's concluding instructions. We presume the jury followed these instructions. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107.) The prosecutor, too, repeatedly told the jury that the evidence of the 2008 incident was being presented solely on the question of intent.[4]

Finally, admission of the evidence of the 2008 incident did not violate appellant's constitutional rights to a fair trial and due process of law. "A person seeking to overturn a conviction on due process grounds bears a heavy burden to show the procedures used at trial were not simply violations of some rule, but are fundamentally unfair. (*Montana v.*

---

[4] In his opening statement, the prosecutor described the expected evidence concerning this incident, telling the jury, "And it is not to consider that because the defendant might have done something before, that he did something now. But it is for you to consider: What was the defendant's intent? What was the defendant's intent with that heroin that was in his pocket? . . . Now you can consider that when you are considering—when you are trying to decide what intent did the defendant have with this heroin after the officer observed him sell, exchange suspected heroin for money, and an earlier incident where he had been involved in the narcotics transaction as well." Again, in closing argument, the prosecutor told the jury, "Additional evidence of the defendant's intent is on the prior incident, and it's very important, you can only consider this prior incident for the purposes of the defendant's intent to sell. The prior incident, he sold to Sergeant Browne in concert with another individual. He not only sold narcotics to Sergeant Browne, but he sold heroin to Sergeant Browne. And he did it two doors down from where he was out selling heroin this time. So you can consider that, to consider that the defendant was out there with the intent to sell drugs." Referring to the prior incident later in argument, the prosecutor told the jury it could consider appellant's dropping the heroin, as well as the marked city funds recovered in that case, "when you are considering what is the defendant's intent? Is he standing out there waiting for Stoneking to come along? What is his intent? And you can consider that."

13

*Egelhoff* (1996) 518 U.S. 37, 43-44.)  Ordinarily, even erroneous admission of evidence does not offend due process unless it is so prejudicial as to render the proceeding fundamentally unfair.  (*People v. Falsetta* (1999) 21 Cal.4th 903, 913; *Estelle v. McGuire* (1991) 502 U.S. 62, 70.)"  (*People v. Esayian* (2003) 112 Cal.App.4th 1031, 1042.)  As we have said, here there was no error in admitting the evidence in question.

## II.

Appellant next contends the evidence was insufficient to support either of his convictions.  With respect to count 1, sale of heroin, appellant contends there was a fatal gap in the evidence because the substance Officer Fergus claimed to see exchanged for money was never recovered, the cash he claimed to see exchanged for the substance was never identified, and the remaining evidence was purely circumstantial.  Appellant contends the evidence for count 2, possession for sale of the heroin recovered from his pocket, was insufficient because the prosecution failed to establish the foundational facts from which its expert could conclude appellant intended to sell this heroin rather than use it himself.

The cases upon which appellant relies in arguing there was a fatal gap in the evidence presented to establish the sale of heroin in count 1 involved alleged sales by the defendant to an informant who subsequently delivered the narcotics to the police. (*People v. Blackshear* (1968) 261 Cal.App.2d 65; *People v. Lawrence* (1959) 168 Cal.App.2d 510; *People v. Barnett* (1953) 118 Cal.App.2d 336; *People v. Richardson* (1957) 152 Cal.App.2d 310.)  In all of these cases, the fatal gap was that the transaction occurred outside the observation of the police, in circumstances where it could not be ascertained that the informant did in fact obtain the narcotics from the defendant. (*Blackshear*, at p. 68 [sale to informer who was not searched beforehand, outside sight of officer, officer did not see what if anything was exchanged between informer and defendant]; *Lawrence*, at pp. 513-514 [sale while informant in defendant's house for period of hours, with others also present including defendant's wife; informant delivered heroin to police after taking taxi for two blocks; money police had given informant found in box on bedside table in defendant's house]; *Barnett*, at pp. 337-338 [unnamed person

14

given two marked bills by police provided police with heroin after spending one and a half hours with defendant outside police sight; defendant in possession of the marked bills, as well as other cash, said he did not know where they came from but had been with woman that afternoon who repaid money she owed him; heroin found in manager's storage closet near defendant's apartment]; *Richardson*, at pp. 312-313 [informant provided heroin to officer after being with appellant and others at defendant's apartment, outside police sight].)

The present case is completely different. First, and most significant, the entire transaction was observed by Officer Fergus. Fergus saw appellant stand in a particular location on the street for several minutes, saw Stoneking approach appellant and engage in conversation, saw Stoneking hand appellant currency which appellant put into his pocket, saw appellant take several small packages out of his pocket that Fergus, in his experience as a narcotics officer, believed to contain heroin, saw appellant display these to Stoneking, then place one in Stoneking's hand and the others back into his pocket. The purchase was not accomplished by an informant who might have had reason to present false evidence to the police but by an unrelated third party with no connection to the police. That the bindle Fergus saw appellant hand to Stoneking was not recovered is not a fatal gap in the evidence. Stoneking left the scene quickly as the arrest team moved in and was out of police sight until he was apprehended a few minutes later; it was entirely reasonable to conclude he disposed of the bindle Fergus saw him take during this interlude. One of the two bindles that remained in appellant's possession was tested and shown to be heroin; it was entirely reasonable to conclude the three bindles contained the same substance. Appellant has cited no case holding that a sale of heroin cannot be established without recovery and testing of the specific heroin involved in the transaction. Nor is it fatal that the particular bill provided by Stoneking was not identified among the cash in appellant's possession. No marked police funds were involved in the transaction. While there was no evidence that cash was recovered from the pocket where Fergus saw appellant place the bill, there was also no evidence it did *not* come from that pocket. The evidence simply failed to establish where on appellant's person the $106 was located.

Appellant, viewing the evidence against him as entirely circumstantial, relies upon the principle stated in *People v. Ollado* (1966) 246 Cal.App.2d 608, 614, that "where evidence of guilt is purely circumstantial it is legally insufficient unless it is so complete as to exclude every reasonable hypothesis of innocence." (*Id*. at p. 611.) *Ollado* involved two sales of narcotics on successive days. The evidence of the first might have been insufficient, because the informant purchaser was not searched before he met with the defendant for several minutes outside the sight of the police; the court saw this as an example of the rule just stated. (*Id.* at pp. 610-611.) There was a second sale, however, that occurred at the same address in the presence of the police, and that second incident was admissible to prove the defendant furnished the narcotics on the first occasion. (*Id.* at pp. 610, 613-614.)

Even in a case based on circumstantial evidence, however, "[o]ur role as an appellate court is clear. We must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *People v. Towler* [(1982)] 31 Cal.3d [105,] 117-118.) As *Towler* explains, 'even though the appellate court may itself believe that the circumstantial evidence might be reasonably reconciled with defendant's innocence, this alone does not warrant interference with the determination of the trier of fact. [Citations.] Whether the evidence presented is direct or circumstantial, . . . the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citations.]' (*Id*. at pp. 118-119.)" (*People v. Ruiz* (1988) 44 Cal.3d 589, 611.)

Officer Fergus, an experienced narcotics officer, directly observed an exchange of cash from Stoneking for what appeared to Fergus to be heroin from appellant. Fergus's description of the transaction fit what the prosecution expert described as the typical pattern of narcotics sales in the area where it occurred, an area known for a high level of narcotics sales. That the substance was in fact heroin was corroborated by the fact that

16

one of the remaining bindles—shown to Stoneking during the transaction—was confirmed to be heroin. In the circumstances, the conclusion that all three bindles contained the same substance was far more reasonable than any speculation that the one transferred to Stoneking was not. Given Fergus's observation of the sale, including the fact that appellant displayed all three bindles to the prospective buyer, the similar packaging of the remaining bindles, and the evidence of appellant's prior sale of heroin in the same location, there was ample evidence to support the jury's conclusion that appellant possessed the remaining bindles with intent to sell, rather than for personal use.

## III.

Appellant contends he is entitled to additional presentence conduct credits under an amendment to Penal Code section 4019 (section 4019) that increased the number of conduct credits available to inmates whose offenses were committed on or after October 1, 2011. Although appellant committed his offense in July 2010 and was sentenced in August 2011, he maintains the new amendment must be applied retroactively under equal protection principles.

Penal Code section 4019 has been amended a number of times, changing the rate at which defendants in presentence custody can earn conduct credit. Prior to January 25, 2010, conduct credits could be accrued at a rate of two days for every four days of actual time in presentence custody. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48 (*Rajanayagam*).) The statutory amendment that took effect January 25, 2010, provided for accrual of custody credits at a rate of two days of custody credit for every two days of actual time served, so that a term of four days would be deemed to have been served for every two days of actual time served. (*Ibid.*, Stats. 2009-2010, 3d Ex. Sess., ch. 28, § 50 (Sen. Bill No. X3 18).) For certain prisoners, however, including those with "a prior conviction for a serious felony, as defined in Section 1192.7, or a violent felony, as defined in Section 667.5," credits would be earned at a lower rate, with a term of six days deemed to have been served for every four days of actual custody. (Stats. 2009-2010, 3d Ex. Sess., ch. 28, § 50 (Sen. Bill No. X3 18) [former § 4019, subds. (b), (c), (f)].) This

was the version of section 4019 in effect when appellant committed his offense in September 2010.

Subsequently, another amendment, effective September 28, 2010, returned to the less generous provision of credit, under which, for all prisoners, a term of six days would be deemed to have been served for every four days actually served. (Stats. 2010, ch. 426, § 2 (Sen. Bill No. 76).)

Penal Code section 4019 was next amended several times during 2011, as part of the Realignment Act, to increase the rate for earning conduct credits, so that for defendants whose crimes were committed on or after October 1, 2011, a term of four days would be deemed to have been served for every two days actually served. (Stats. 2011, ch. 15, § 482 (Assem. Bill No. 109); Stats. 2011, ch. 39, § 53 (Assem. Bill No. 117); Stats. 2011-2012 1st Ex. Sess. ch. 12, § 35.) The stated purpose of the Realignment Act was " 'to reduce recidivism and improve public safety, while at the same time reducing corrections and related criminal justice spending.' " (*People v. Rajanayagam, supra,* 211 Cal.App.4th at p. 49, quoting *People v. Cruz* (2012) 207 Cal.App.4th 664, 679.) The Digest for the bills by which the Realignment Act was adopted stated that they addressed the fiscal emergency declared by the governor pursuant to his constitutional authority. (Stats. 2011, ch. 15, Legis. Counsel's Dig., par. 17 (Assem. Bill No. 109); Stats. 2011, ch. 12, Dig., par. 19 (Assem. Bill No. X1 17).)[5] Subdivision (h) of this

---

[5] The Legislative Digest for Assembly Bill No. 109 stated, "The California Constitution authorizes the Governor to declare a fiscal emergency and to call the Legislature into special session for that purpose. The Governor issued a proclamation declaring a fiscal emergency, and calling a special session for this purpose, on January 20, 2011. [¶] This bill would state that it addresses the fiscal emergency declared by the Governor by proclamation issued on January 20, 2011, pursuant to the California Constitution." (Stats. 2011, ch. 15, Legis. Counsel's Dig., par. 17 (Assem. Bill No. 109).)

The Legislative Counsel's Digest for Assembly Bill No. X1 17 similarly stated, "The California Constitution authorizes the Governor to declare a fiscal emergency and to call the Legislature into special session for that purpose. Governor Schwarzenegger issued a proclamation declaring a fiscal emergency, and calling a special session for this

18

currently operative version of the statute provides, "The changes to this section enacted by the act that added this subdivision shall apply prospectively and shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after October 1, 2011. Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law."

By the terms of the current version of section 4019, it does not apply to appellant, whose crime was committed prior to October 1, 2011. Under subdivision (h), appellant's presentence credits were to be calculated under the version of section 4019 in effect at the time of his crime and sentencing. At the time of the crime, September 6, 2010, section 4019 provided that a term of four days would be deemed served for every two days of actual time served, except that for a prisoner with a prior serious felony conviction (or in certain other circumstances) a term of six days would be deemed served for every four days of actual custody. (Stats. 2009-2010, 3d Ex. Sess., ch. 28, § 50 (Sen. Bill No. X3 18) [former § 4019, subds. (b), (c), (f)].) By the time appellant was sentenced in August 2011, section 4019 provided that for all prisoners, a term of six days would be deemed served for each four days of actual custody. (Stats. 2010, ch. 426, § 2 (Sen. Bill No. 76).)

Appellant contends that the equal protection clauses of the state and federal Constitutions require that the current version of section 4019 be applied retroactively. Recognizing that *People v. Brown* (2012) 54 Cal.4th 314 held to the contrary with respect to the January 25, 2010 version of section 4019, appellant relies upon *In re Kapperman* (1974) 11 Cal.3d 542 to argue a different result should obtain here. As *Brown* pointed out, however, *Kapperman* dealt with a statute providing credit for presentence *custody*

_____

purpose, on December 6, 2010. Governor Brown issued a proclamation on January 20, 2011, declaring and reaffirming that a fiscal emergency exists and stating that his proclamation supersedes the earlier proclamation for purposes of that constitutional provision. [¶] This bill would state that it addresses the fiscal emergency declared and reaffirmed by the Governor by proclamation issued on January 20, 2011, pursuant to the California Constitution." (Stats. 2011, ch. 12, Legis. Counsel's Dig., par. 19 (Assem. Bill No. X1 17).)

credits, not *conduct* credits. (*Brown*, at p. 326.) This distinction was critical to the *Brown* court because "[c]redit for time served is given without regard to behavior" whereas conduct credit was intended to be an incentive for good behavior. (*Ibid.*) The appellant in *Brown* sought to apply the new amendment increasing the rate of accrual of *conduct* credits to presentence custody that predated the effective date of the amendment. *Brown* concluded that the purpose of conduct credits—to provide incentive for good conduct—could not be served by retroactive application because a prisoner's conduct could only be affected by the incentive if he or she was aware of it. (*Id.* at p. 327.) Prospective application of the law did not violate equal protection guarantees because the group of prisoners serving presentence custody before enactment of the amendment and the group serving presentence custody after the amendment were not similarly situated with respect to the purpose of the law. (*Id.* at pp. 328-329.) " '[I]nmates were only similarly situated with respect to the purpose of [the new law] on [its effective date], when they were all aware that it was in effect and could choose to modify their behavior accordingly.' " (*Brown*, at p. 329, quoting *In re Strick* (1983) 148 Cal.App.3d 906, 913.)

Appellant argues that all inmates in presentence custody earning conduct credits are similarly situated in that all have the same incentive to behave properly, and that for this purpose, there is no basis for distinguishing the group who committed their crimes before October 1 from those who committed their crimes after that date. This argument has been rejected. Our Supreme Court stated in *People v. Lara* (2012) 54 Cal.4th 896, 906, footnote 9 (*Lara*), concerning the argument that the Legislature denied equal protection by making the currently effective version of section 4019 expressly prospective, " '[t]he obvious purpose' " of a law increasing conduct credits " 'is to affect the behavior of inmates by providing them with incentives to engage in productive work and maintain good conduct while they are in prison.' [Citation.] '[T]his incentive purpose has no meaning if an inmate is unaware of it. The very concept demands prospective application.' " (*Brown*, at p. 329, quoting *In re Strick*[, *supra*,] 148 Cal.App.3d [at p.] 913.) Accordingly, prisoners who serve their pretrial detention before

20

such a law's effective date, and those who serve their detention thereafter, are not similarly situated with respect to the law's purpose. (*Brown*, at pp. 328–329.)

Several cases have considered whether equal protection requires application of the current section 4019 to inmates serving presentence custody *after* the October 1, 2011, effective date of the amendment for crimes committed *before* that date. *Rajanayagam*, *supra*, 211 Cal.App.4th at page 53, found such inmates similarly situated. Other courts have reached the contrary conclusion. (*People v. Kennedy* (2012) 209 Cal.App.4th 385, 396-397; see also, *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1552-1553.) Even *Rajanayagam* found no equal protection violation, however, because the different treatment of inmates based on the date of their crimes was rationally related to the Legislature's stated purpose of cost savings. (*Rajanayagam*, at p. 55; see *Kennedy*, at p. 397)

"Where, as here, the statutory distinction at issue neither touches upon fundamental interests nor is based on gender, there is no equal protection violation if the challenged classification bears a rational relationship to a legitimate state purpose. ([*People v. Hofsheier* (2006) 37 Cal.4th 1185,] 1201; [*People v.*] *Cruz, supra*, 207 Cal.App.4th at pp. 677-679.) Under the rational relationship test, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. (*Hofsheier, supra*, 37 Cal.4th at p. 1202.)" (*Rajanayagam, supra,* 211 Cal.App.4th at p. 53.)

"[I]n choosing October 1, 2011, as the effective date of Assembly Bill No. 109, the Legislature took a measured approach and balanced the goal of cost savings against public safety. The effective date was a legislative determination that its stated goal of reducing corrections costs was best served by granting enhanced conduct credits to those defendants who committed their offenses on or after October 1, 2011. To be sure, awarding enhanced conduct credits to everyone in local confinement would have certainly resulted in greater cost savings than awarding enhanced conduct credits to only

21

those defendants who commit an offense on or after the amendment's effective date. But that is not the approach the Legislature chose in balancing public safety against cost savings. (*[People v.] Floyd* [(2003)] 31 Cal.4th [179,] 190 [Legislature's public purpose predominate consideration].) Under the very deferential rational relationship test, we will not second-guess the Legislature and conclude its stated purpose is better served by increasing the group of defendants who are entitled to enhanced conduct credits when the Legislature has determined the fiscal crisis is best ameliorated by awarding enhanced conduct credit to only those defendants who committed their offenses on or after October 1, 2011." (*Rajanayagam, supra,* 211 Cal.App.4th at pp. 55-56.)

The reasoning of the *Rajanayagam* court is all the stronger when applied to appellant's argument that he is entitled to the enhanced conduct credit provisions of a statutory amendment that did not become effective until after he was sentenced.

There was an error with respect to calculation of appellant's presentence custody credits, however. As indicated above, the January 25, 2010, version of section 4019 provided for one-to-one custody credits *except* for certain categories of prisoners, including those with a prior conviction for a serious felony, as defined in section Penal Code section 1192.7, or a violent felony, as defined in section Penal Code section 667.5. For these prisoners, credits were to be earned at a lower rate, with a term of six days deemed to have been served for every four days of actual custody. (Stats. 2009-2010, 3d Ex. Sess., ch. 28, § 50 (Sen. Bill No. X3 18) [former § 4019, subds. (b), (c), (f)].) Appellant's prior robbery conviction, which the trial court found true, is such a serious or violent felony. (Pen. Code, §§ 1192.7, subd. (c)(19), 667.5, subd. (c)(9).)

The trial court believed that because it struck the robbery prior, appellant was entitled to the one-for-one credits the statute prescribed for defendants without disqualifying circumstances. This was not correct: A court's authority to strike a prior conviction under Penal Code section 1385 does not permit it to "disregard the historical facts that disqualify a local prisoner from earning day-for-day conduct credits under former section 4019." (*Lara, supra,* 54 Cal.4th at p. 900.) The *Lara* court explained: "Section 1385 permits a court, 'in furtherance of justice, [to] order an action to be

22

dismissed.'  (*Id.*, subd. (a).)  Although the statute literally authorizes a court to dismiss only an entire criminal action, we have held it also permits courts to dismiss, or 'strike,' factual allegations relevant to sentencing, such as those that expose the defendant to an increased sentence.  (E.g., *People v. Superior Court (Romero)* [(1996)] 13 Cal.4th 497, 504 [prior serious or violent convictions alleged in order to invoke the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12)]; *People v. Burke* [(1956) ] 47 Cal.2d 45, 50-51 [prior narcotics conviction alleged in order to invoke former statute requiring state prison term].)  However, the court's power under section 1385 is not unlimited; it reaches only the 'individual charges and allegations in a criminal action.'  (*People v. Thomas* (2005) 35 Cal.4th 635, 644.)  Thus, a court may not strike facts that need not be charged or alleged, such as the sentencing factors that guide the court's decisions whether to grant probation (see Cal. Rules of Court, rule 4.414) or to select the upper, middle or lower term for an offense (*id.*, rules 4.421, 4.423).  (See generally *In re Varnell* (2003) 30 Cal.4th 1132, 1137, 1139.)

"The historical facts that limit a defendant's ability to earn conduct credits do not form part of the charges and allegations in a criminal action.  Certainly a court must afford a defendant due process—notice and a fair hearing—in determining the amount of conduct credit to which he or she is entitled.  (*People v. Duesler* (1988) 203 Cal.App.3d 273, 276–277.)  But the courts of this state have rejected the argument that the People must allege credit disabilities in the accusatory pleading or prove the disabling facts to the trier of fact. . . ."  (*Lara*, *supra*, 54 Cal.4th at pp. 900-901.)

" '[W]hen a court has struck a prior conviction allegation it has not "wipe[d] out" that conviction as though the defendant had never suffered it; rather, the conviction remains a part of the defendant's personal history' and available for other sentencing purposes.  (*People v. Garcia* (1999) 20 Cal.4th 490, 499; see *In re Varnell, supra,* 30

Cal.4th 1132, 1138; *People v. Burke, supra*, 47 Cal.2d 45, 51.)" (*Lara, supra*, 54 Cal.4th at pp. 906-907.)[6]

Appellant maintains that *Lara* is distinguishable because the trial court in that case exercised its discretion to dismiss the prior whereas in the present case the prosecutor moved to dismiss the prior. This was indeed the trial court's reasoning in awarding appellant one-for-one conduct credits. In addressing appellant's motion to strike, the trial court pressed the prosecutor, who was not opposing the motion, to be clear whether the prosecution was moving to strike or leaving the matter to the court's discretion, expressly noting that its discretion might well be exercised in the contrary direction. The prosecutor moved to strike and the court granted the motion.

Penal Code section 1385 authorizes the trial judge to dismiss an action "either on his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice." In *Lara,* the court struck the prior as part of a negotiated disposition; in the present case, the court granted the prosecution's motion to strike. Nothing in the rationale of *People v. Lara* limits its application to situations where the prosecutor does not make a motion to strike: Whether on motion of the prosecutor or on its own motion, the court's authority to strike a prior conviction allegation derives from

---

   **6** The *Lara* court further elaborated: "Concerning notice, the court in *People v. Fitzgerald* (1997) 59 Cal.App.4th 932 (*Fitzgerald*), held that an information charging the defendant with violent felonies gave him sufficient notice that, if convicted, section 2933.1 would restrict his presentence conduct credits to 15 percent of the maximum otherwise permitted. The People were not required to plead the effect that a conviction would have on credits. (*Fitzgerald*, at pp. 936–937.) Concerning proof, the court in *People v. Garcia* (2004) 121 Cal.App.4th 271 concluded that the question whether a defendant's current felony offenses were 'violent' (§ 667.5), and thus limited his credits under section 2933.1, was 'part of the trial court's traditional sentencing function' (*Garcia*, at p. 274), rather than a question that had to be decided by the jury. Although the federal Constitution requires that any fact, ' " [o]ther than the fact of a prior conviction . . . that increases the penalty for a crime beyond the prescribed statutory maximum . . . be submitted to a jury, and proved beyond a reasonable doubt" ' (*Garcia*, at p. 277, quoting *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490), facts invoked to limit conduct credits do not increase the penalty for a crime beyond the statutory maximum (*Garcia*, at p. 277)." (*Lara, supra,* 54 Cal.4th at pp. 900-901.)

Penal Code section 1385. Former section 4019 provided that presentence conduct credits would be earned at a less favorable rate for a prisoner who "has a prior conviction for a serious felony, as defined in Section 1192.7, or a violent felony, as defined in Section 667.5." (Former § 4019, subds. (b)(2), (c)(2); Stats. 2009-2010, 3d Ex. Sess., ch. 28, § 50 (Sen. Bill No. X3 18).) The statute did not impose any requirement of pleading and proof of the prior. As explained in *Lara,* the prior conviction was a "historical fact" limiting appellant's presentence conduct credits and remained so despite the court striking it under section 1385. (*Lara*, *supra*, 54 Cal.4th at pp. 906-907.) Under the terms of former section 4019, the court lacked authority to award one-for-one credits. Because appellant had a prior conviction for a serious or violent felony, his entitlement to conduct credits was limited to four days of credit for each six days of actual time served. (Former § 4019, subds. (b)(2), (c)(2), (f); Stats. 2009-2010, 3d Ex. Sess., ch. 28, § 50 (Sen. Bill No. X3 18).)

The method of calculation for conduct credits under this statute is to take the number of actual custody days, divide by four (disregarding any remainder), then multiply by two. (*In re Marquez* (2003) 30 Cal.4th 14, 26.) Here, appellant's 456 actual days in custody, divided by four, results in 114, which multiplied by two results in 228 custody credits. Adding the 456 actual days and 228 custody credits, appellant's presentence credits total 684. The abstract of judgment must be modified to so reflect.

Although this determination results in appellant receiving fewer presentence credits than the trial court awarded, errors in the calculation of presentence credits "result in an unauthorized sentence, and are subject to correction by the trial court or the appellate court when presented. (See *People v. Walkkein* (1993) 14 Cal.App.4th 1401, 1411.) The correction should be made even if it results in less credit (and hence a longer term in custody) for the defendant. (*People v. Serrato* [(1973)] 9 Cal.3d [753,] 763.)" (*People v. Guillen* (1994) 25 Cal.App.4th 756, 764.)[7] The Attorney General need not

_____

[7] *People v. Serrato, supra,* 9 Cal.3d at page 764, explained that while double jeopardy prohibits imposition of a more severe penalty after retrial where the initial

appeal but may raise the issue of an unauthorized sentence in connection with the defendant's appeal.  (*People v. Delgado* (2010) 181 Cal.App.4th 839, 854-855.)

## DISPOSITION

The abstract of judgment shall be corrected to reflect a total of 684 presentence credits, rather than 912.  As so corrected, the judgment is affirmed.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

---

sentence was lawful, "[t]he rule is otherwise when the court pronounces an unauthorized sentence.  Such a sentence is subject to being set aside judicially and is no bar to the imposition of a proper judgment thereafter, even though it is more severe than the original unauthorized pronouncement."